# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, on behalf of themselves and all others similarly situated, | Civil Action No. 4:23-cv-00788-SRB |
| | [Consolidated with 4:23-cv-00945-SRB] |
| Plaintiffs, | Hon. Stephen R. Bough |
| v. | JURY TRIAL DEMANDED |
| THE NATIONAL ASSOCIATION OF REALTORS, et al., | |
| Defendants. | |
| JEREMY KEEL, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, RHONDA BURNETT, DON GIBSON, LAUREN CRISS, JOHN MEINERS, DANIEL UMPA, CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, and JANE RUH, individually and on behalf of all others similarly situated, | Civil Action No.  25-cv-00759 |
| | JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| CHARLES RUTENBERG REALTY, INC., TIERRA ANTIGUA REALTY, LLC, WEST USA REALTY, INC., MY HOME GROUP REAL ESTATE, LLC, Defendants. | |

## DECLARATION OF STEVE W. BERMAN IN SUPPORT OF
## MOTION FOR PRELIMINARY APPROVAL

011207-11/3291802 V1

I, Steve W. Berman, state under oath, as follows:

1.	I am the Managing Partner of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"). The Court in *Moehrl v. Nat'l Ass'n of Realtors*, Case No. 1:19-cv-01610-ARW (N.D. Ill.) ("*Moehrl*") appointed my firm, together with Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), and Susman Godfrey LLP ("Susman Godfrey"), as Co-Lead Class Counsel in the *Moehrl* litigation.

2.	Hagens Berman, Cohen Milstein, and Susman Godfrey also served as co-counsel for Plaintiffs in *Umpa v. Nat'l Ass'n of Realtors*, Case No. 4:23-cv-00945-FJG (W.D. Mo.) until that case was consolidated with this case ("Gibson") on April 23, 2024. (Gibson Doc. 145, Umpa Docs. 245–246). Our three firms, together with Ketchmark & McCreight, P.C. ("Ketchmark &McCreight"), Boulware Law LLC ("Boulware Law") and Williams Dirks Dameron LLC ("Williams Dirks Dameron") now serve as co-counsel for Plaintiffs in the consolidated *Gibson* action. (Gibson Doc. 146). The Court appointed these six firms as Interim Co-Lead Class Counsel in this case, with responsibility "for any settlement negotiations with Defendants." (Gibson Doc. 180). The Court also appointed the six firms as Co-Lead Counsel for the Settlement Classes in the first nine *Gibson* Settlements. (See Gibson Docs. 163, 297, and 348).

3.	I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Settlements with Hanna Holdings, Inc., William Raveis Real Estate, Inc., EXIT Realty Corp. International and EXIT Realty Corp., USA; and Windermere Real Estate Services Company, Inc. and William L. Lyon & Associates, Inc.; and Plaintiffs' Motion for Preliminary Approval of Settlements with West USA Realty, Inc., My Home Group Realty, LLC, Tierra Antigua Realty, LLC, and Charles Rutenberg Realty, Inc. Based on personal knowledge or discussions with

011207-11/3291802 V1

counsel in my firm and co-counsel regarding the matters stated herein, if called upon, I could and would testify competently thereto.

4.    I have served as lead or co-lead counsel in antitrust, securities, consumer, products liability, and employment class actions, and other complex litigation matters throughout the country. For example, I have represented thousands of plaintiffs in large antitrust cases and have achieved favorable results for them. I was the lead trial lawyer in *In re National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litig.*, MDL No. 2541 (N.D. Cal.) where the class obtained injunctive relief following a bench trial. As co-lead counsel in *In re Visa Check/Mastercard Antitrust Litig.*, No. 96-cv-05238 (E.D.N.Y.), I obtained the then largest antitrust settlement in history for consumers while challenging alleged anti-competitive agreements among U.S. banks, Visa, and Mastercard, regarding ATM fees. I also represented consumers in *In re Optical Disk Drive Products Antitrust Litig.*, No. 10-md-2143-RS (N.D. Cal.), *In re Electronic Books Antitrust Litig.*, No. 11-md-02293 (DLC) (S.D.N.Y.), and *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02430 (N.D. Cal.), obtaining court-approved settlements for class members in all three cases. I was approved as co-lead counsel to represent a certified class of thousands of consumers in *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637 (N.D. Ill. May 27, 2022), ECF No. 5644. I have negotiated numerous settlements in class and non-class cases during my decades of practice.

5.    Proposed Settlement Class Counsel are the following law firms:

- Ketchmark & McCreight, P.C.,

- Boulware Law LLC,

- Williams Dirks Dameron LLC,

- Cohen Milstein Sellers & Toll PLLC,

- Hagens Berman Sobol Shapiro LLP, and

- Susman Godfrey LLP.

6.    Proposed Settlement Class Counsel are highly experienced in the areas of antitrust and class action litigation. They have tried antitrust class actions to verdict and prosecuted and settled numerous others. Hagens Berman, Cohen Milstein, and Susman Godfrey—Co-Lead Class Counsel in *Moehrl*—each have extensive antitrust class action experience and have successfully prosecuted some of the most complex private antitrust cases in the last two decades. Each has a history of winning landmark verdicts and negotiating favorable settlements for their clients. Their collective and individual litigation experience—discussed in the memorandum of law and exhibits filed in Support of Plaintiffs' Motion for Appointment of Interim Co-Lead Class Counsel—amply demonstrates that all six firms have extensive knowledge of the relevant law, as well as the resources for effective representation of Settlement Class Plaintiffs, and the proven ability to reach superior results for parties injured by anticompetitive practices. (*Gibson* Doc. 156).

7.    On behalf of Plaintiffs, other Co-Lead Counsel and I personally participated in intensive settlement negotiations with opposing counsel and/or analysis and deliberation among the Plaintiffs' legal team regarding settlement terms with: (a) Hanna Holdings, Inc. ("Hanna Holdings"); (b) William Raveis Real Estate, Inc. ("William Raveis"); (c) EXIT Realty Corp. International and EXIT Realty Corp., USA (collectively "EXIT Realty"); (d) Windermere Real Estate Services Company, Inc. and William L. Lyon & Associates, Inc. (collectively "Windermere & Lyon"); (e) West USA Realty, Inc. ("West USA"); (f) My Home Group Realty, LLC ("My Home"); (g) Tierra Antigua Realty, LLC ("Tierra Antigua"); and (h) Charles Rutenberg Realty, Inc. ("Charles Rutenberg") (collectively "Settling Defendants").

8.    The Settlements are attached hereto as follows:

Exhibit A -- Hanna Holdings;

Exhibit B -- William Raveis;

Exhibit C -- EXIT Realty;

Exhibit D -- Windermere & Lyon;

Exhibit E -- West USA;

Exhibit F -- My Home;

Exhibit G -- Tierra Antigua; and

Exhibit H -- Charles Rutenberg.

9.     Each Settlement was achieved through extensive negotiations. To achieve a settlement with Hanna Holdings, the parties had an in-person mediation, attended by lead counsel for each party, facilitated by Greg Lindstrom, who has served as a mediator on multiple mediations in this case. This followed months of direct negotiations between Plaintiffs and counsel for Hanna Holdings. To achieve a settlement with William Raveis, the parties had a mediation, attended by lead counsel for each party, facilitated by Jay Daugherty, who has served a mediator on multiple mediations in this case. To achieve a settlement with Windermere & Lyon, the parties had a mediation, attended by lead counsel for each party, facilitated by Greg Lindstrom. To achieve a settlement with EXIT Realty, the parties engaged in extensive direct settlement discussions over several months. To achieve a settlement with Tierra Antigua, the parties had a mediation, attended by lead counsel for each party, facilitated by David Duncan, who has served as a mediator on multiple mediations in this case. To achieve a settlement with West USA, the parties had a mediation, attended by lead counsel for each party, facilitated by David Duncan. To achieve a settlement with Charles Rutenberg, the parties engaged in extensive direct settlement negotiations. To achieve a settlement with My Home, the parties engaged in

011207-11/3291802 V1

direct settlement discussions. For each settlement, the parties reached agreement only after numerous hours of negotiation.

10.     In my opinion, and in that of highly experienced Co-Lead Counsel, the proposed Settlement Agreements are fair, reasonable, and adequate. They provide substantial monetary and non-monetary benefits to the Settlement Classes, and they avoid the risks, costs, and delay of continuing protracted litigation against Settling Defendants. Details of the agreed monetary relief, changes to or maintenance of the Settling Defendants' business practices, and cooperation in Plaintiffs' ongoing litigation against the non-settling defendants are set forth in the Settlement Agreements attached as Exhibits A-H.

11.     Plaintiffs and Class Counsel reached the Settlement Agreements after arms-length negotiations and considering the risk and cost of litigation. Plaintiffs and Class Counsel believe the claims asserted are meritorious and that the evidence developed to date supports the claims, but also recognize the risk and delay of proceedings in a complex case like this, and believe that the Settlements confer substantial benefits upon the Settlement Class Members.

12.     In my opinion, the Settlements are fair and reasonable in light of the financial condition of each Defendant, and the limited resources available to each to satisfy a judgment as compared to the size of the potential damages. Pursuant to FRE 408, Plaintiffs received and carefully reviewed detailed financial records from Defendants. Counsel assessed whether Settling Defendants could withstand a greater payment. The monetary settlements were reached with due consideration for the Defendants' ability to pay a judgment or settlement.

13.     Class Counsel have discussed the Settlement Agreements with the Class Representatives, and they have approved them.

14.     There was no collusion among counsel for the parties at any time during these settlement negotiations. To the contrary, the negotiations were contentious, hard fought, and fully informed. Plaintiffs sought to obtain the largest possible monetary recovery, as well as the most impactful changes to (or agreements to maintain) the Settling Defendants' business practices to avert potentially anticompetitive conduct going forward. Plaintiffs further sought the most helpful cooperation possible from Settling Defendants.

15.     When the Settlement Agreements were executed with Defendants in this action, Co-Lead Counsel were fully aware of the strengths and weaknesses of each side's positions. Extensive litigation and settlement negotiations in the related actions *Moehrl*, *Burnett*, and *Gibson*, laid the foundation for expeditiously achieving favorable settlements with Defendants. The parties in *Burnett* and *Moehrl* completed over five years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests for production, followed by the production of well over 5 million pages of documents from the parties and dozens of non-parties across both actions. Plaintiffs briefed numerous discovery motions and disputed items in order to obtain important evidence to support their claims. The parties conducted over 100 depositions in the *Moehrl* action and over 80 depositions in the *Burnett* action. *Moehrl* Plaintiffs engaged six experts and *Burnett* Plaintiffs engaged five experts to support their claims and to rebut claims from the nine experts retained by Defendants in each case. Most experts in the case were deposed after the submission of 24 expert reports in *Moehrl* and 19 expert reports in *Burnett*. The Plaintiffs in both cases also briefed summary judgment, and the Plaintiffs in *Burnett* prevailed at trial, including against NAR, and briefed post-trial motions.

16.     Discovery in *Burnett* and *Moehrl* focused on the nationwide rules and practices of NAR and its members. Class Counsel and experts in *Burnett* and *Moehrl* analyzed rules, policies,

011207-11/3291802 V1

practices, and transaction data, including on a nationwide basis. They also evaluated whether those policies and practices differed among MLSs across the country. Class Counsel obtained and analyzed information regarding the entire industry, and not just the MLSs and Defendants at issue in *Burnett* and *Moehrl*.

17.    During the course of the *Burnett* and *Moehrl* litigation, Plaintiffs' counsel engaged in extensive arm's-length settlement negotiations with various defendants in those cases that lasted nearly four years, including several in-person and telephonic mediations with a nationally recognized and highly experienced mediator, mediations with a retired federal court judge and a federal magistrate judge, and dozens of one-on-one calls and direct communications. This work resulted in Settlement Agreements in those actions that required NAR and several of the largest real estate brokerage firms to abolish the challenged rules, provide cooperation in litigation against non-settling defendants,

18.    Proposed Settlement Class Counsel are the same attorneys who successfully represented home sellers in the *Burnett, Moehrl*, and *Gibson* actions—and who prevail at trial in *Burnett* and achieved favorable settlements on behalf of home sellers. Proposed Settlement Class Counsel then used their work in those actions to further benefit the class. Plaintiffs filed the *Gibson* and *Umpa* actions alleging a nationwide class against additional Defendants. Based on their extensive work and research in *Burnett* and *Moehrl*, as well as in this action, Co-Lead Counsel were well informed of the value and consequences of the Settlement Agreements.

19.    In addition, in my opinion, the named Plaintiffs have ably represented the interests of the proposed class. Each has served as a named plaintiff in other litigation involving real estate commissions and has experience litigating such claims. In addition, each named Plaintiff

considered and approved the Settlements. Each also approved the filing of the complaint and is prepared to represent the Class.

20.     Given the considerable cost of issuing class notice in a case of this size, and the total Settlement Amount provided by these Settlements, I believe it would serve the best interest of the Class to implement a combined notice program that includes notice of several settlement in the *Gibson* and *Keel II* actions. This would enable the Parties to make more efficient use of settlement funds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed September 29, 2025.

_____

_____

STEVE W. BERMAN

# Exhibit A

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

DON GIBSON, LAUREN CRISS, JOHN MEINERS, and
DANIEL UMPA, individually and on behalf of themselves
and all others similarly situated,

      Plaintiffs,

   v.

THE NATIONAL ASSOCIATION OF REALTORS, et al.

      Defendants.

Case No. 23-CV-788-SRB

[Consolidated with
4:23-CV-00945-SRB]

Hon. Stephen R. Bough

# SETTLEMENT AGREEMENT

Docusign Envelope ID: 985C2802-B235-4E6C-8FCE-1091087A6E29

This Settlement Agreement ("Settlement Agreement") is made and entered into this 5th day of August, 2025 (the "Execution Date"), by and between Defendant Hanna Holdings, Inc. ("Hanna Holdings"), and Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa (collectively "Plaintiffs"), who filed suit in the above-captioned actions (now consolidated) ("the Actions") both individually and as representatives of one or more classes of home sellers. Plaintiffs enter this Settlement Agreement both individually and on behalf of the Settlement Class, as defined below.

WHEREAS, in the Actions, Plaintiffs allege that Hanna Holdings participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act;

WHEREAS, Hanna Holdings denies Plaintiffs' allegations in the Actions and has asserted defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for Hanna Holdings, including mediations with a nationally recognized and highly experienced mediator, leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-Hanna Holdings Defendants unless Plaintiffs separately settle with any of the Non-Hanna Holdings Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions and have concluded that a settlement with Hanna Holdings according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, Hanna Holdings believes that it is not liable for the claims asserted and has good defenses to Plaintiffs' claims and meritorious pre-trial and post-trial motions, but

nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, Hanna Holdings, in addition to any settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between Hanna Holdings and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to Hanna Holdings only, without costs to Plaintiffs, the Settlement Class or Hanna Holdings except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

## A.     Definitions

The following terms, as used in this Settlement Agreement, have the following meanings:

1.      "Actions" means *Gibson v. NAR*, Case No. 23-CV-788-SRB (W.D. Mo.) ("*Gibson*") and *Umpa v. NAR*, Case No. 23-CV-945-SRB (W.D. Mo.) (*Umpa*), which have been consolidated.

2.      "Corporate Defendants" means any defendant aside from the National Association of Realtors ("NAR") named in *Gibson*, *Umpa*, *Burnett v. NAR*, No. 19-CV-0332-SRB (W.D. Mo.) ("*Burnett*"), or *Moehrl v. NAR*, Case No. 1:19-CV-01610 (N.D. Ill.) ("*Moehrl*").

3.      "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.

> 11161 Overbrook Road, Suite 210
> Leawood, KS 66211
>
> BOULWARE LAW LLC
> 1600 Genessee, Suite 416
> Kansas City, MO 64102
>
> WILLIAMS DIRKS DAMERON LLC
> 1100 Main Street, Suite 2600
> Kansas City, MO 64105
>
> HAGENS BERMAN SOBOL SHAPIRO LLP
> 1301 Second Avenue, Suite 2000
> Seattle, WA 98101
>
> COHEN MILSTEIN SELLERS & TOLL PLLC
> 1100 New York Ave. NW, Fifth Floor
> Washington, DC 20005
>
> SUSMAN GODFREY LLP
> 1201 Third Avenue, Suite 3800
> Seattle, Washington 98101

4.      "Court" means the U.S. District Court for the Western District of Missouri.

5.      "Defendants" means Hanna Holdings and all defendants named in either *Gibson* or *Umpa*.

6.      "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

7.      "Effective Date" means the date when: (a) the Court has entered both a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against Hanna Holdings with prejudice; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to

3

Docusign Envelope ID: 985C2802-B235-4E6C-8FCE-1091087A6E29

further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-Hanna Holdings Defendant or any person or entity related to the Non-Hanna Holdings Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section. This section shall not be construed as an admission that any Non-Hanna Holdings Defendant or any person or entity related to the Non-Hanna Holdings Defendant has standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

8. "*Gibson*" means the now consolidated Western District of Missouri Case No. 23-cv-788-SRB, which is currently pending.

9. "Opt-Out Sellers" means members of the Settlement Class who have timely and validly exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

10. "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

11. "Released Claims" means any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in

4

the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

12.     "Released Parties" means Hanna Holdings and all of its respective past, present and future direct and indirect corporate parents (including holding companies), individual owners, subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, franchisors, sub-franchisors, officers, directors, managing directors, members, managers, employees, agents, brokers, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' and sub-franchisors' officers, directors, managing directors, members, managers, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-Hanna Holdings Corporate Defendants not included within the preceding definition, or their past, present and future direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, members, managers, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns.  For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the Released Parties and other times associated with a different Corporate Defendant are included as Released Parties for the periods

of time they were associated with the Released Parties and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release Hanna Holdings or any other Person for any claims based on the conduct of any real estate brokerage acquired by Hanna Holdings or any other Person that becomes affiliated with Hanna Holdings after the Execution Date for conduct which took place before the Execution Date.

13. "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, members, managers, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

14. "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

15. "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges: (i) homes in Arkansas, Kentucky, and Missouri: October 31, 2018 to the date of Class Notice; (ii) homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming: October 31, 2017 to the date of Class Notice; and (iii) for all other

homes: October 31, 2019 to the date of Class Notice. For the avoidance of doubt, Plaintiffs and Hanna Holdings intend this Settlement Agreement to provide for and the Settlement Class Definition to encompass a nationwide class with a nationwide settlement and release, including, but not limited to, all persons who sold a home nationwide that was listed on any and all non-NAR multiple listing services, which shall include, but are not limited to, transactions associated with the West Penn Multi-List, Inc. and the Central New York Information Service. Such release is intended to apply to all related cases in which a Hanna Holdings entity is a party defendant or may be a party defendant.

16. "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

17. "Settling Parties" means Plaintiffs and Hanna Holdings.

18. "Total Monetary Settlement Amount" means payment of $32 million (Thirty-Two Million Dollars) in United States currency. All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount, and Hanna Holdings will pay nothing apart from the Total Monetary Settlement Amount.

19. "*Umpa*" means Western District of Missouri Case No. 23-cv-00945, which has now been consolidated with *Gibson*.

**B.**     **Stipulation to Class Certification**

20. The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Hanna Holdings. The Settling Parties stipulate and agree to the conditional certification of the

Settlement Class for purposes of this Settlement only. Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

21.     Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by Hanna Holdings that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**C.**     **Approval of this Settlement Agreement and Dismissal of the Actions**

22.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of Class Notice under Federal Rules of Civil Procedure 23(c) and (e)); scheduling a final fairness hearing to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to Hanna Holdings; and Hanna Holdings's cooperation by providing information reflecting its ability to pay limitations and, if requested by Co-Lead Counsel, a declaration describing and attesting to those limitations.

23.     Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). Plaintiffs shall file the Motion within 60 days of the Execution Date. The Motion shall include a proposed form order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement. The proposed form of the preliminary approval order shall be acceptable to Hanna Holdings provided that it is substantially in the form of the orders proposed in connection with the Compass and Douglas Elliman settlements in *Gibson*. At least

48 hours before submission to the Court, the papers in support of the Motion for preliminary approval shall be provided by Co-Lead Counsel to Hanna Holdings for its review. To the extent that Hanna Holdings objects to any aspect of the Motion, it shall communicate such objection to Co-Lead Counsel and the Settling Parties shall meet and confer to resolve any such objection. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of mediator Gregory P. Lindstrom and will endeavor to resolve any issues to the satisfaction of the Court.

24.     The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement with any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets the requirements of due process and Federal Rule of Civil Procedure 23 ("Class Notice"). Plaintiffs will provide Hanna Holdings with the form of notice that they decide upon. To the extent that Hanna Holdings has any comments, it should provide them within 48 hours of receiving the form of notice. The Settling Parties agree to the use of JND as a claims and notice administrator. The timing of any request to disseminate Class Notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

25.     Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, shall, at Hanna Holdings's expense to be credited against the Total Monetary Settlement Amount and not to exceed $200,000, cause notice of the Settlement Agreement to be

served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

26.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to Hanna Holdings:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to Hanna Holdings only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to Hanna Holdings.

27.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

**D.     <u>Releases, Discharge, and Covenant Not to Sue</u>**

28.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement,

*Execution Copy*

interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust claims brought in the Actions. For the avoidance of doubt, this includes claims arising from the same factual predicate, including claims that could be brought under similar state and federal statutes. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties: (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

29. The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal with Prejudice in the Actions shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES NOT

**KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR"; or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of this Settlement Agreement.

30. The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Action), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions.

E.    <u>Payment of the Settlement Amount</u>

31.    Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). Within 30 business days after preliminary approval of the Settlement by the Court, Hanna Holdings will deposit $11,000,000 into the Escrow Account. Hanna Holdings will pay an additional $10,500,000 into the Escrow Account on or before one year from preliminary approval. Hanna Holdings will pay an additional $10,500,000 into the Escrow Account on or before two years from preliminary approval. All accrued interest from Hanna Holdings's payments into the Escrow Account shall be for the benefit of the Settlement Class unless the Settlement is not approved, or is rescinded, in which case the interest shall be for the benefit of Hanna Holdings.

F.    <u>The Settlement Fund</u>

32.    The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund. In no event will Hanna Holdings's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

33.    The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to

13

Docusign Envelope ID: 985C2802-B235-4E6C-8FCE-1091087A6E29

Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

34.     After preliminary approval of the Settlement and approval of a Class Notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class. Hanna Holdings will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $2,500,000 to pay the costs for notice. If notice of one or more other settlements is included in the notice of the Hanna Holding settlement, then the cost of such notice will be apportioned equitably between (or among) the Hanna Holdings Settlement Fund and the other settling Defendant(s)'s settlement fund(s). The amount spent or accrued for notice and notice administration costs is not refundable to Hanna Holdings in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become Effective.

35.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund. Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or class representative incentive awards, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award up to the amount specified in Paragraph 18 above for such fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in

the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

36.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

37.     Hanna Holdings will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement.  Hanna Holdings's only payment obligation is to pay the Total Monetary Settlement Amount.

38.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers.  The Settlement will be non-reversionary except as set forth below in Section H.  If the Settlement becomes Effective, no proceeds from the Settlement will revert to Hanna Holdings regardless of the claims that are made.

39.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 34 and 35 above and 42 below.

40.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court.  Hanna Holdings will have no participatory or approval rights with respect to the Plan of Allocation.  It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the

fairness, reasonableness, and adequacy of the Settlement Agreement. The Settlement Class, Plaintiffs, and Hanna Holdings shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

41.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against Hanna Holdings or the Released Parties.

**G.     Taxes**

42.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. Hanna Holdings has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to Hanna Holdings. In the event the Settlement does not become Effective and any funds including interest or other income are returned to Hanna Holdings, Hanna Holdings will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income in connection with the Settlement Fund. Hanna Holdings makes no representations regarding, and will not be

16

responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**H.** **<u>Rescission</u>**

43.     If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if such approval is modified in or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by Hanna Holdings or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement.  A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order.  The Settling Parties have agreed that, after the deadline for filing timely opt-out requests has passed, Plaintiffs will provide to Hanna Holdings a list of exclusion requests.

44.     If the Settlement or Settlement Agreement is rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to Hanna Holdings.  In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to Hanna Holdings.  Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to Hanna Holdings.

45.     If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions in the Actions as of May 1, 2025.  Plaintiffs and Hanna Holdings agree that any rulings or judgments that occur in the Actions on or after May 1, 2025 and before this Settlement Agreement is rescinded will not bind Plaintiffs, Hanna Holdings, or any of the Released Parties.  Plaintiffs and Hanna Holdings agree to waive any argument or claim of issue preclusion against Plaintiffs or Hanna Holdings arising from such rulings or judgments.  In the event of rescission, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations or agreements made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose.  Hanna Holdings and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by Hanna Holdings or the Plaintiffs, including, but not limited to, any defenses concerning the Court's lack of personal jurisdiction over Hanna Holdings or any Released Parties.  The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from May 1, 2025, until the date this Settlement or Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

46.     Hanna Holdings warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Settlement Agreement is executed and will be deemed to warrant and represent that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Settlement Amount are actually transferred or

made to the Escrow Account. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the actual transfer of the Settlement Amount, or any portion thereof, by or on behalf of Hanna Holdings to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Hanna Holdings, then, at the election of Co-Lead Counsel, the Settlement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

47.     The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

48.     Hanna Holdings reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

## I.      Practice Changes

49.     As soon as practicable, and in no event later than six months after the Effective Date, Hanna Holdings (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will implement the following practice changes:

> i.     advise and periodically remind Hanna Holdings's company-owned brokerages, franchisees (if any), and their agents that there is no Hanna Holdings requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;
>
> ii.    require that any Hanna Holdings company-owned brokerages and their agents (and recommend and encourage that any franchisees (if any) and their agents)

disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then Hanna Holdings will require that any company-owned brokerages and their agents (and recommend and encourage that any Hanna Holdings franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii.   prohibit all Hanna Holdings company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees (if any) and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv.   require that Hanna Holdings company-owned brokerages and their agents disclose to their client at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

v.   prohibit Hanna Holdings company-owned brokerages and their agents (and recommend and encourage that any franchisees (if any) and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict

listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.   advise and periodically remind Hanna Holdings company-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees (if any) and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii.   for each of the above points, for Hanna Holdings company-owned brokerages, franchisees (if any), and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

50.   If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 49 will sunset five years after the Effective Date.

51.   Hanna Holdings acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its reasonable best efforts to implement the practice changes specified in this Section to the extent not yet fully implemented, as soon as practicable, and in no event later than six months after the Effective Date.

**J.   <u>Cooperation</u>**

52.   Hanna Holdings (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will provide valuable cooperation to Plaintiffs as follows in the Actions, including to the extent that any is consolidated pursuant to *In re Real Estate Commission*

21

Docusign Envelope ID: 985C2802-B235-4E6C-8FCE-1091087A6E29

*Antitrust Litigation* (MDL No. 3100), including but not limited to the following. Any disputes regarding the scope of these provisions or compliance with these provisions can be referred to Gregory P. Lindstrom or another mediator, mutually chosen by the parties, for binding resolution. The Settling Parties agree that the terms specified in their Confidential Supplemental Agreement will further govern the data produced under this paragraph.

     i.     Hanna Holdings will use reasonable best efforts to produce relevant summary-level, companywide transactional data limited to the class period. To the extent reasonably possible, this data will be (i) aggregated on a quarterly basis and will provide transactional volume, transactional value, and commissions paid on a state by state basis; and (ii) sufficient to show volume of commerce and the average commission percentage. The data will be produced at a similar time to when other Defendants produce transactional data in *Gibson*. The data shall not be used or disclosed for any purpose whatsoever other than the prosecution or defense of claims in, or the settlement of, *Gibson*. Upon conclusion of *Gibson*, Plaintiffs and their representatives shall promptly destroy the data and certify to Hanna Holdings that they have done so.

     ii.     Hanna Holdings will use reasonable best efforts to produce documents sufficient to show (to the extent such documents exist) its and its officers, employees, and agents' membership and participation in NAR; and that Hanna Holdings was subject to, and whether Hanna Holdings complied with, the challenged NAR rules during the class period, including whether and how Hanna Holdings accepted, adopted and implemented the challenged NAR rules, if at all.

*Execution Copy*

iii.  Hanna Holdings will provide up to seven hours of 30(b)(6) testimony and up to seven hours of 30(b)(1) testimony across no more than two 30(b)(1) witnesses. The time only includes Plaintiff questioning and does not include questioning by any other party. Notwithstanding anything to the contrary in this Paragraph, no Hanna Holdings deposition witness will sit for more than seven hours on the record of questioning, including questioning from Plaintiffs and any other party, provided that Plaintiffs get up to 4.5 hours. Hanna Holdings will make one, mutually agreed upon, witness available at trial, as necessary, and provide access via counsel to that witness prior to trial testimony for up to two (2) hours.

iv.  Hanna Holdings will use reasonable best efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

v.  Hanna Holdings will use reasonable best efforts to provide the facts necessary to establish that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, if any of those exceptions are applicable, by declarations or affidavits if possible, or at hearings or trial if necessary;

vi.  Hanna Holdings will use reasonable best efforts at its expense to provide relevant class member and listing data and answer questions about that data to support the provision of Class Notice, administration of any settlements, or the litigation of the Actions;

23

vii. If another Defendant includes a witness on a witness list who is then a current officer or employee of Hanna Holdings or its subsidiaries, Hanna Holdings will cooperate in providing access via counsel to that witness prior to trial testimony; and

viii. Hanna Holdings will agree not to provide greater assistance in discovery or trial to any Defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

53. Hanna Holdings's cooperation obligations, as set forth in Paragraph 52, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

54. Hanna Holdings's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to Hanna Holdings. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-Hanna Holdings Defendants and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

55. Hanna Holdings acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its reasonable best efforts to provide the cooperation specified in this Section.

### K. **Miscellaneous**

56.     This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party. Hanna Holdings denies the material allegations of the complaints in the Actions. Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Hanna Holdings, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by Hanna Holdings in any proceeding, or be offered as a concession or agreement to jurisdiction in any court in Missouri (other than in connection with the enforcement of this Settlement Agreement) by Hanna Holdings or any Released Parties in any proceeding.

57.     This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations before a neutral mediator, Gregory P. Lindstrom of Phillips ADR Services. The Settling Parties reached the Settlement Agreement after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation. The terms of the Settlement Agreement continue to be subject to mediation privilege and must be kept strictly confidential until a motion for preliminary approval is filed—except as agreed in writing by the Settling Parties or as necessary or advisable for Hanna Holdings to meet any financial reporting obligations and its obligations to any lender or creditor in the reasonable discretion of its legal counsel, including, but not limited to, any press release that the Settling Parties may issue disclosing the existence of the Settlement and the Total Settlement Amount.

58.     Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions. The Parties will not use Hanna Holdings's

agreement to be governed by Missouri law as grounds for personal jurisdiction or proper venue in any litigation, including, but not limited to, continued litigation in the Actions in the event that the Settlement is not finally approved. For the avoidance of doubt, Hanna Holdings does not waive and reserves all defenses and rights, including, but not limited to, those concerning personal jurisdiction and venue.

59.     This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-Hanna Holdings Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties. All rights of any Settlement Class Member against any Non-Hanna Holdings Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

60.     This Settlement Agreement constitutes the entire agreement among Plaintiffs and Hanna Holdings pertaining to the Settlement of the Actions against Hanna Holdings. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and Hanna Holdings.

61.     This Settlement Agreement may be executed in counterparts by Plaintiffs and Hanna Holdings, and a DocuSign, facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

62.     Neither Plaintiffs nor Hanna Holdings shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

*Execution Copy*

63.     The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

64.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

65.     The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

66.     Any disputes between Hanna Holdings and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented to Gregory P. Lindstrom for his assistance in mediating a resolution, and if a resolution is not reached, to binding arbitration with Gregory P. Lindstrom.

67.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

*Execution Copy*

68.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

28

CO-LEAD COUNSEL

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

_____
Boulware Law LLC

_____
Williams Dirks Dameron LLC

Hanna Holdings, Inc.

By: _____
Annie Hanna Engel, Chief Legal Officer

Docusign Envelope ID: 985C2802-B235-4E6C-8FCE-1091087A6E29

*Execution Copy*

<u>**APPENDIX A**</u>

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, individually and on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 23-CV-788-SRB |
| THE NATIONAL ASSOCIATION OF REALTORS, et al. | [Consolidated with Case No. 23-CV-945-SRB] |
| Defendants. | |

30

Docusign Envelope ID: 985C2802-B235-4E6C-8FCE-1091087A6E29

Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa (collectively "Plaintiffs") and Defendant Hanna Holdings, Inc. ("Hanna Holdings") (collectively, "the Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, each firm defined in the Settlement Agreement as Co-Lead Counsel desires to give an undertaking (the "Undertaking") for repayment of the award of attorneys' fees, costs, and expenses approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned counsel, individually and as agent for his/her law firm, hereby submits both to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Settlement Agreement.

By receiving any payments pursuant to the Settlement Agreement, Co-Lead Counsel and their shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Western District of Missouri for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to Hanna Holdings, based upon written instructions provided by Hanna Holdings, the full amount of the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund, including any accrued interest.

Docusign Envelope ID: 985C2802-B235-4E6C-8FCE-1091087A6E29

In the event the Settlement Agreement becomes Effective, but the attorneys' fees, costs, and expenses awarded by the Court or any part of them are vacated, overturned, modified, reversed, or rendered void as a result of an appeal, Co-Lead Counsel shall within thirty (30) days repay to the Settlement Fund, based upon written instructions provided by the settlement administrator, the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the final settlement order and judgment pertaining to attorneys' fees, such that the finality of those fees no longer remains in doubt.

In the event Co-Lead Counsel fails to repay to Hanna Holdings any of the attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court shall, upon application of Hanna Holdings, and notice to Co-Lead Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Co-Lead Counsel.

The undersigned stipulate, warrant, and represent that they have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of each firm identified as Co-Lead Counsel. This agreement will only be effective upon its execution by each firm identified in the Settlement Agreement as Co-Lead Counsel.

Co-Lead Counsel acknowledge that this Undertaking is a material component of the Settlement Agreement and agree to use its reasonable efforts to timely effect the terms specified in this Undertaking. Each undersigned warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Undertaking is executed.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:

_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

_____
Boulware Law LLC


_____
Williams Dirks Dameron LLC

# Exhibit B

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

DON GIBSON, LAUREN CRISS, JOHN MEINERS, and
DANIEL UMPA, individually and on behalf of themselves
and all others similarly situated,

       Plaintiffs,

  v.

THE NATIONAL ASSOCIATION OF REALTORS, et. al.

       Defendants.

Case No. 23-CV-788-SRB

[Consolidated with
4:23-cv-00945-SRB]

Hon. Stephen R. Bough

**SETTLEMENT AGREEMENT**

This Settlement Agreement ("Settlement Agreement") is made and entered into this 2nd day of May, 2025 (the "Execution Date"), by and between Defendant William Raveis Real Estate, Inc. ("Raveis"), and Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa, (collectively "Plaintiffs"), who filed suit in the above captioned actions (now consolidated) both individually and as representatives of one or more classes of home sellers. Plaintiffs enter this Settlement Agreement both individually and on behalf of the Settlement Class, as defined below.

WHEREAS, in the Actions Plaintiffs allege that Raveis participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act and corresponding state laws;

WHEREAS, Raveis denies Plaintiffs' allegations in the Actions and has asserted defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for Raveis, including mediation with a nationally recognized and highly experienced mediator, leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-Raveis Defendants unless Plaintiffs separately settle with any of the Non-Raveis Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, and have concluded that a settlement with Raveis according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, Raveis believes that it is not liable for the claims asserted and has good defenses to Plaintiffs' claims and meritorious pre-trial and post-trial motions, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the

distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, Raveis, in addition to any settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between Raveis and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to Raveis only, without costs to Plaintiffs, the Settlement Class or Raveis except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

A.      **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.      "Actions" means Gibson v. NAR, (W.D. Mo. Case No. 23-CV-00788-SRB) and Umpa v. NAR, (W.D. Mo. Case No. 23-CV-00945-SRB), which have been consolidated.

2.      "Corporate Defendants" means any defendant aside from the National Association of Realtors ("NAR") named in the Actions, Burnett v. NAR, (W.D. Mo. Case No. 19-CV-0332-SRB) ("Burnett"), or Moehrl v. NAR, (N.D. Ill. Case No. 1:19-cv-01610).

3.      "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

2

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101

4.　"Court" means the U.S. District Court for the Western District of Missouri.

5.　"Defendants" means Raveis and all defendants named in either Gibson or Umpa.

6.　"Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

7.　"Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against Raveis with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-Raveis Defendant or any person or entity related to the Non-Raveis Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal

with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

8.  "Gibson" means the now consolidated Western District of Missouri Case No. 23-cv-00788-SRB, which is currently pending and has been consolidated with Umpa, Case No. 23-cv-00945.

9.  "Opt-Out Sellers" means members of the Settlement Class who have timely and validly exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

10. "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

11. "Released Claims" means any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

12. "Released Parties" means Raveis and all of its respective past, present and future, direct and indirect corporate parents (including holding companies), individual owners, subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and

all of their respective franchisees, franchisors, sub-franchisors, officers, directors, managing directors, shareholders (limited to members of the Raveis family and their trusts), members, managers, employees, agents, brokers, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' and sub-franchisors' officers, directors, managing directors, shareholders (limited to members of the Raveis family and their trusts), members, managers, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-Raveis Corporate Defendants not included within the preceding definition, or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, members, managers, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the Released Parties and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with the Released Parties and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release Raveis or any other Person for any claims based on the conduct of any real estate brokerage acquired by Raveis after the Execution Date, or any other Person affiliated with such an

5

acquired brokerage that becomes affiliated with Raveis after the Execution Date, for conduct which took place before the Execution Date.

13.    "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, members, shareholders, managers, insurers, general or limited partners, members, managers, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

14.    "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

15.    "Settlement Class" means the class of Persons that will be certified by the Court for settlement purposes only, namely, all Persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges: (i) for homes in Arkansas, Kentucky, and Missouri: October 31, 2018 to the date of Class Notice; (ii) for homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming: October 31, 2017 to the date of Class Notice; and (iii) for all other homes: October 31, 2019 to the date of Class Notice. For the avoidance of doubt, Plaintiffs and Raveis intend this Settlement Agreement to provide for and the Settlement Class definition to encompass and provide for a nationwide class with a nationwide settlement and release, including,

but not limited to, all Persons who sold a home nationwide that was listed on any and all NAR and/or non-NAR multiple listing services, which shall include, but are not limited to, transactions listed on any multiple listing service owned, operated, or governed by, or affiliated with, the Connecticut Association of Realtors (or its regional and local associations), and transactions associated with the Real Estate Board of New York ("REBNY") and/or on the REBNY Residential Listing Service ("RLS"), as well as MLS Property Information Network, Inc. ("MLS PIN"), Listing Information Network, Inc. ("LINK Nantucket"), Nantucket Association of Real Estate Brokers, Inc. ("NAREB/Association for Nantucket"), State Listings, Inc. ("NY State MLS"), and Resides, Inc. and/or Resides HHI, Inc. ("Resides MLS"). Such release is intended to apply to all related cases in which a Raveis entity is a party defendant or may be a party defendant.

16.    "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

17.    "Settling Parties" means Plaintiffs and Raveis.

18.    "Total Monetary Settlement Amount" means payment of $4.1 million (Four Million One Hundred Thousand Dollars) in United States currency. All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount, and Raveis will pay nothing apart from the Total Monetary Settlement Amount.

19.    "Umpa" means Western District of Missouri Case No. 23-cv-00945, which is currently pending and has now been consolidated with Gibson.

## B.    <u>Stipulation to Class Certification</u>

20.    The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and,

subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Raveis. The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only. Should, for whatever reason, the Settlement not become Effective, or is validly rescinded by Raveis or the Plaintiffs, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

21.     Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by Raveis that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**C.**     **Approval of this Settlement Agreement and Dismissal of the Actions**

22.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e)); scheduling a final fairness hearing to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to Raveis; and Raveis's cooperation by providing information reflecting its ability to pay limitations and, if requested by Co-Lead Counsel, a declaration describing and attesting to those limitations, provided that such declarations are confidential and may not be filed in court except if necessary and in any event only under seal.

23.     Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). Plaintiffs shall file the Motion within 30 days of the Execution Date, and endeavor to timely seek a hearing on the Motion for preliminary approval no later than September 1, 2025. The Motion shall include a proposed form of order preliminarily

approving the Settlement and enjoining the Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement. The proposed form of the preliminary approval order shall be acceptable to Raveis provided that it is substantially in the form of the orders proposed in connection with the Compass and Douglas Elliman settlements in Gibson. At least 48 hours before submission to the Court, the papers in support of the Motion for preliminary approval shall be provided by Co-Lead Counsel to Raveis for its review. To the extent that Raveis objects to any aspect of the Motion, it shall communicate such objection to Co-Lead Counsel and the Settling Parties shall meet and confer to resolve any such objection. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of mediator Jay Daugherty and will endeavor to resolve any issues to the satisfaction of the Court.

24. The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement with any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets the requirements of due process and Federal Rule of Civil Procedure 23 ("Class Notice"). Plaintiffs will provide Raveis with the form of notice that they decide upon. To the extent that Raveis has any comments, it should provide them within 24 hours of receiving the form of notice. The Settling Parties agree to the use of JND as a claims and notice administrator. The timing of any request to disseminate Class Notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

25.     Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, shall at Raveis's expense to be paid from the Escrow Account and credited against the Total Monetary Settlement Amount, and not to exceed $200,000, cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

26.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to Raveis:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to Raveis only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to Raveis.

27.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

**D.** **Releases, Discharge, and Covenant Not to Sue**

28.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims.  The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions. For the avoidance of doubt, this includes claims arising from the same factual predicate that could be brought under similar state and federal statutes.  In connection therewith, upon the Effective Date, each of the Releasing Parties: (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims.  For the avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

29.     The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal with Prejudice in the Actions shall have, fully, finally, and forever settled and

released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of this Settlement Agreement.

30. The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily

injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in the Actions.

### E.      Payment of the Settlement Amount

31.      Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). Within thirty (30) business days after preliminary approval of the Settlement by the Court, Raveis will deposit $1,000,000 into the Escrow Account. Raveis will pay an additional $1,000,000 into the Escrow Account on or before June 30, 2026. Raveis will pay an additional $1,000,000 into the Escrow Account on or before June 30, 2027. Raveis will pay an additional $1,100,000 into the Escrow Account on or before March 30, 2028. All Escrow Account deposits by Raveis shall be credited toward the Total Monetary Settlement Amount. All accrued interest from Raveis's payments into the Escrow Account shall be for the benefit of the Settlement Class unless the Settlement is not approved, does not become Effective, or is validly rescinded by Raveis or the Plaintiffs, in which case the interest shall be for the benefit of Raveis.

### F.      The Settlement Fund

32.      The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid

out of the Settlement Fund.  In no event will Raveis's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

33.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement.  Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval.  The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court.  The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

34.     After preliminary approval of the Settlement and approval of a Class Notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class.  Raveis will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $200,000 to pay the costs for notice.  If notice of one or more other settlements is included in the notice of the Raveis settlement, then the cost of such notice will be apportioned equitably between (or among) the Raveis Settlement Fund and the other settling Defendant(s)' settlement funds.  The amount spent or accrued for notice and notice administration costs is not refundable to Raveis in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become Effective.

35.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund.  Within 14 business days after any order by the Court awarding attorneys' fees,

expenses, or class representative incentive awards, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award up to the amount specified in Paragraph 18 above for such fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective or if it is validly rescinded by Raveis or the Plaintiffs.

36.    The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

37.    Raveis will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement.  Raveis's only payment obligation is to pay the Total Monetary Settlement Amount.

38.    There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers.  The Settlement will be non-reversionary except as set forth below in Section H.  If the Settlement becomes Effective, no proceeds from the Settlement will revert to Raveis regardless of the claims that are made.

39.    No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 34 and 35 above and 42 below.

40.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court.  Raveis will have no participatory or approval rights, liability, or obligations with respect to the Plan of Allocation.  It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement.  The Settlement Class, Plaintiffs, and Raveis shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

41.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against Raveis or the Released Parties.

**G.     Taxes**

42.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund.  All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund.  Raveis has no responsibility to make any

filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective or if it is validly rescinded by Raveis or the Plaintiffs, and the Settlement Fund is returned to Raveis. In the event the Settlement does not become Effective or if it is validly rescinded by Raveis or the Plaintiffs, and any funds including interest or other income are returned to Raveis, Raveis will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income. Raveis makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**H.**     <u>**Rescission**</u>

43.     If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if such approval is modified in or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by Raveis or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within ten (10) business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order. The Settling Parties have agreed in a Confidential Supplemental Agreement that, after the deadline for filing timely Opt-Out requests has passed, Plaintiffs will provide to Raveis a list of exclusion requests.

In its sole discretion, Raveis shall have the right to rescind or terminate this Settlement Agreement if the Opt-Out requests for exclusion exceed the threshold specified in the Confidential Supplemental Agreement.

44.     If the Settlement or Settlement Agreement does not become Effective or if it is validly rescinded by Raveis or the Plaintiffs, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to Raveis.  In the event that the Settlement Agreement does not become Effective or is rescinded, the funds already expended from the Settlement Fund, or that have been incurred but not yet paid from the Settlement Fund, for the costs of notice and notice administration up to $200,000 will not be returned to Raveis.

45.     If the Settlement or Settlement Agreement does not become Effective or is validly rescinded by Raveis or the Plaintiffs before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions in the Actions as of March 11, 2025.  Plaintiffs and Raveis agree that any rulings or judgments that occur in the Actions on or after March 11, 2025, and before this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, will not bind Plaintiffs, Raveis, or any of the Released Parties. Plaintiffs and Raveis agree to waive any argument of claim or issue preclusion against Plaintiffs or Raveis arising from such rulings or judgments.  In the event of rescission or failure of the Settlement or the Settlement Agreement to become Effective, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations or agreements made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose.  Raveis and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is validly rescinded by Raveis or the Plaintiffs, including, but not limited to, any arguments concerning the Court's lack of personal

jurisdiction over Raveis or any Released Parties, improper venue, arbitration, or the failure to meet the requirements for a class action.  The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from March 11, 2025, until the date this Settlement or Settlement Agreement is rescinded or fails to become Effective, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

46.     Raveis warrants and represents that it is not "insolvent" within the meaning of the applicable bankruptcy laws as of the time the Execution Date, and, will be deemed to warrant and represent, that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Total Monetary Settlement Amount are actually transferred or made to the Escrow Account.  In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the actual transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of Raveis to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Raveis, then, at the election of Plaintiffs' counsel, the Settlement may be terminated and rescinded and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

47.     The Settling Parties' rights to terminate or rescind this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

48.     Raveis reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

## I.  Practice Changes

49.  As soon as practicable, and in no event later than six months after the Effective Date, Raveis (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will implement or, to the extent already implemented, will maintain the following practices:

> i. advise and periodically remind Raveis's company-owned brokerages, franchisees (if any), and their agents that there is no Raveis requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;

> ii. require that any Raveis company-owned brokerages and their agents (and recommend and encourage that any franchisees (if any) and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms.  In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then Raveis will require that any company-owned brokerages and their agents (and recommend and encourage that any Raveis franchisees and their agents) include a disclosure

with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii.    prohibit all Raveis company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees (if any) and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free.

iv.    require that Raveis company-owned brokerages and their agents disclose to their client at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

v.    prohibit Raveis company-owned brokerages and their agents (and recommend and encourage that any franchisees (if any) and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.    advise and periodically remind Raveis company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees (if any) and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii.   for each of the above points, for Raveis company owned brokerages, franchisees (if any), and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

50.   If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 49 will sunset five years after the Effective Date.

51.   Raveis acknowledges that the implementation and/or continuation of the practices set forth here are a material component of this Settlement Agreement and agrees to use its reasonable best efforts to implement the practice changes specified in this Section to the extent not yet fully implemented, as soon as practicable, and in no event later than six months after the Effective Date.

## J.   Cooperation

52.   Raveis (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees or sub-franchisors) will use reasonable best efforts to provide valuable cooperation to Plaintiffs as follows in the Actions, including to the extent that any is consolidated pursuant to *In re Real Estate Commission Antitrust Litigation* (MDL No. 3100). Any disputes regarding the scope of these provisions or compliance with these provisions can be referred to Jay Daugherty or another mediator, mutually chosen by the Settling Parties, for binding resolution. Upon conclusion of the Actions, or if needed for claims processing or administration purposes, upon disposition of the settlement funds and any judgments in these Actions, Plaintiffs and their representatives, including Co-Lead Counsel, promptly shall return the data and documents provided by Raveis pursuant to this Paragraph 52, or destroy such data and documents and certify to Raveis that they have done so. All data, information, documents, and depositions provided under this Paragraph

52 shall be covered by the Stipulated Protective Order (Dkt. 368) in the Actions, including any amendments thereto.

     i.    Raveis will use reasonable best efforts to produce relevant summary-level, companywide transactional data limited to the class period. To the extent reasonably possible, this data will be (i) aggregated on a quarterly basis and will provide transactional volume, transactional value, and commissions paid on a state by state basis; and (ii) sufficient to show volume of commerce and the average commission percentage. The data will be produced at a similar time to when other Defendants produce transactional data in *Gibson*. The data shall not be used or disclosed for any purpose whatsoever other than the prosecution or defense of claims in, or the settlement of, *Gibson*. Upon conclusion of *Gibson*, Plaintiffs and their representatives shall promptly destroy the data and certify to Raveis that they have done so.

     ii.    Raveis will use reasonable best efforts to produce documents sufficient to show (to the extent such documents exist) its and its officers, employees, and agents' membership and participation in NAR; and that Raveis was subject to, and whether Raveis complied with, the challenged NAR rules during the class period, including whether and how Raveis accepted, adopted and implemented the challenged NAR rules, if at all.

     iii.    Raveis will use reasonable best efforts to provide up to seven hours of 30(b)(6) testimony and up to seven hours of 30(b)(1) testimony across no more than two 30(b)(1) witnesses. The time only includes Plaintiff questioning and does not include questioning by any other party. Notwithstanding anything to the

contrary in this Paragraph, no Raveis deposition witness will sit for more than seven hours on the record of questioning, including questioning from Plaintiffs and any other party, provided that Plaintiffs get up to 4.5 hours. Raveis will make one, mutually agreed upon, witness available at trial, as necessary, and provide access via counsel to that witness prior to trial testimony for up to two (2) hours.

iv. Raveis will use reasonable best efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

v. Raveis will use reasonable best efforts to provide the facts necessary to establish that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, if any of those exceptions are applicable, by declarations or affidavits if possible, or at hearings or trial if necessary;

vi. Raveis will use reasonable best efforts at its expense to provide relevant reasonably accessible class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

vii. if another Defendant includes a witness on a witness list who is then a current officer or employee of Raveis or its subsidiaries, Raveis will reasonable best

efforts to cooperate in providing access via counsel to that witness prior to trial testimony; and

viii.    Raveis will agree not to provide greater assistance in discovery or trial to any defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

53.    Raveis's cooperation obligations, as set forth in Paragraph 52, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

54.    Raveis's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to Raveis.  Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-Raveis Defendants and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

55.    Raveis acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its reasonable best efforts to provide the cooperation specified in this Section.

## K.    <u>Miscellaneous</u>

56.    This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party.

Raveis denies the material allegations of the complaints in the Actions. Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Raveis, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by Raveis in any proceeding, or be offered as a concession or agreement to jurisdiction or venue in any court in Missouri (other than in connection with the enforcement of this Settlement Agreement) by Raveis or any Released Parties in any proceeding.

57. This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations before a neutral mediator, Jay Daugherty, of Jay Daugherty Mediation & Arbitration. The Settling Parties reached the Settlement Agreement after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation. The terms of the Settlement continue to be subject to mediation privilege and must be kept strictly confidential until a motion for preliminary approval is filed—except as agreed in writing by the Settling Parties or as necessary or advisable for Raveis to meet any financial reporting obligations and its obligations to any lender, creditor, or auditor in the reasonable discretion of its legal counsel, including, but not limited to, any press release that Raveis may issue disclosing the existence of the Settlement and the Total Settlement Amount.

58. Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions. The Parties will not use Raveis's agreement to be governed by Missouri law as grounds for personal jurisdiction or venue in any litigation, including, but not limited to, continued litigation in the Actions in the event that the Settlement Agreement does not become Effective or is validly rescinded by Raveis or the Plaintiffs. For the

avoidance of doubt, Raveis does not waive and reserves all defenses and rights, including, but not limited to, concerning personal jurisdiction, venue, arbitration, or class action requirements.

59.    This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-Raveis Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties. All rights of any Settlement Class Member against any Non-Raveis Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

60.    This Settlement Agreement constitutes the entire agreement among Plaintiffs and Raveis pertaining to the Settlement of the Actions against Raveis. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and Raveis.

61.    This Settlement Agreement may be executed in counterparts by Plaintiffs and Raveis, and a DocuSign, facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

62.    Neither Plaintiffs nor Raveis shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

63.    The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

64.    The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement. The Parties will not use Raveis's agreement that the Court shall retain jurisdiction over the implementation and enforcement of this Settlement

Agreement and the Settlement as grounds for personal jurisdiction or venue in any litigation, including, but not limited to, continued litigation in the Actions in the event that the Settlement Agreement does not become Effective or is validly rescinded by Raveis or the Plaintiffs. For the avoidance of doubt, Raveis does not waive and reserves all defenses and rights, including, but not limited to, concerning personal jurisdiction, venue, arbitration, or class action requirements.

65.     The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

66.     Any disputes between Raveis and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented to Jay Daugherty for his assistance in mediating a resolution, and if a resolution is not reached, to binding arbitration with Jay Daugherty.

67.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

68.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement on behalf of their respective clients.

CO-LEAD COUNSEL

_____

Hagens Berman Sobol Shapiro LLP

_____

Cohen Milstein Sellers & Toll PLLC

_____

Susman Godfrey LLP

_____

Ketchmark & McCreight PC

_____

Boulware Law LLC

_____

Williams Dirks Dameron LLC


William Raveis Real Estate, Inc.

By: _____

    Bill Raveis, CEO

## APPENDIX A

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | |
|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, individually and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et. al.<br><br>    Defendants. | Case No. 23-CV-788-SRB<br><br>[Consolidated with Case No. 23-cv-945-SRB] |

Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa (collectively "Plaintiffs") and Defendant William Raveis Real Estate, Inc. ("Raveis") (collectively, "the Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, each firm defined in the Settlement Agreement as Co-Lead Counsel desires to give an undertaking (the "Undertaking") for repayment of the award of attorneys' fees, costs, and expenses approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned Co-Lead Counsel, individually and as agent for his/her law firm, hereby submits both to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Settlement Agreement.

By receiving any payments pursuant to the Settlement Agreement, Co-Lead Counsel and their shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Western District of Missouri for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to Raveis, based upon written instructions provided by Raveis, the full amount of the attorneys' fees, costs, and expenses paid to Co-Lead Counsel from the Settlement Fund, including any accrued interest.

In the event the Settlement Agreement becomes Effective, but the attorneys' fees, costs, and expenses awarded by the Court or any part of them are vacated, overturned, modified, reversed, or rendered void as a result of an appeal, Co-Lead Counsel shall within thirty (30) days repay to the Settlement Fund, based upon written instructions provided by the settlement administrator, the attorneys' fees, costs, and expenses paid to Co-Lead Counsel from the Settlement Fund in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the final settlement order and judgment pertaining to attorneys' fees, such that the finality of those fees no longer remains in doubt.

In the event Co-Lead Counsel fails to repay to Raveis any of attorneys' fees, costs, and expenses that are owed to it pursuant to this Undertaking, the Court shall, upon application of Raveis, and notice to Co-Lead Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Co-Lead Counsel.

The undersigned stipulate, warrant, and represent that they have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of each firm identified as Co-Lead Counsel. This agreement will only be effective upon its execution by each firm identified in the Settlement Agreement as Co-Lead Counsel.

Co-Lead Counsel acknowledge that this Undertaking is a material component of the Settlement Agreement and agree to use their reasonable efforts to timely effect the terms specified in this Undertaking. Each undersigned Co-Lead Counsel warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Undertaking is executed.

33

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:

_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP


_____
Ketchmark & McCreight PC


_____
Boulware Law LLC


_____
Williams Dirks Dameron LLC

# Exhibit C

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

DON GIBSON, LAUREN CRISS, JOHN MEINERS, and
DANIEL UMPA, individually and on behalf of themselves and
all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF REALTORS, et. al.

        Defendants.

Case No. 4:23-cv-00788-SRB

[Consolidated with
4:23-cv-00945-SRB]

Hon. Stephen R. Bough

**SETTLEMENT AGREEMENT**

This Settlement Agreement ("Settlement Agreement") is made and entered into this 31st day of March, 2025 (the "Execution Date"), by and between Defendant EXIT Realty Corp. International and EXIT Realty Corp. USA (collectively, "EXIT Realty") and Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa, who filed suit in the above captioned actions (now consolidated) both individually and as a representative of the Settlement Class, as defined below.

WHEREAS, in the Actions Plaintiffs allege that EXIT Realty participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act;

WHEREAS, EXIT Realty denies Plaintiffs' allegations in the Actions and has asserted defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for EXIT Realty leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-EXIT Realty Defendants unless Plaintiffs separately settle with any of the Non-EXIT Realty Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, and have concluded that a settlement with EXIT Realty according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, EXIT Realty believes that it is not liable for the claims asserted and that it has good defenses to Plaintiffs' claims and meritorious pre-trial and post-trial motions, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

2

95716\324308772.v1

WHEREAS, EXIT Realty, in addition to the settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between EXIT Realty and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to EXIT Realty only, without costs to Plaintiffs, the Settlement Class or EXIT Realty except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

A.     **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.     "Actions" means Gibson v. NAR, (W.D. Mo. Case No. 4:23-cv-00788-SRB) and Umpa v. NAR, (W.D. Mo. Case No. 4:23-cv-945-SRB).

2.     "Corporate Defendants" means any defendant aside from the National Association of Realtors named in Umpa v. NAR, (W.D. Mo. Case No. 4:23-cv-945-SRB), Gibson v. NAR, (W.D. Mo. Case No. 4:23-cv-00788-SRB), Burnett v. NAR, (W.D. Mo. Case No. 19-cv-00332-SRB), or Moehrl v. NAR, (N.D. Ill. Case No. 1:19-cv-01610).

3.     "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

3

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101

4.      "Court" means the U.S. District Court for the Western District of Missouri.

5.      "Defendants" means EXIT Realty Corp. International and EXIT Realty Corp. USA, and all defendants named in either Gibson or Umpa.

6.      "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

7.      "Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against EXIT Realty with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-EXIT Realty Defendant or any person or entity related to the Non-EXIT Realty Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal with

4

95716\324308772.v1

respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

8.     "Gibson" means Western District of Missouri Case No. 4:23-cv-00788, which is currently pending and which has been consolidated with Umpa, Case No. 4:23-cv-00945.

9.     "Opt-Out Sellers" means members of the Settlement Class who have timely exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

10.     "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

11.     "Released Claims" means any and all manner of federal and state claims regardless of the cause of Actions arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

12.     "Released Parties" means EXIT Realty and all of its respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, sub-franchisors, officers, directors, shareholders, members, managers, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other

5

95716\324308772.v1

representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisors', franchisees' and sub-franchisors' officers, directors, shareholders, managing directors, members, managers, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-EXIT Realty Corporate Defendants, or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, shareholders, members, managers, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the EXIT Realty entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with EXIT Realty and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release EXIT Realty or any other Person for any claims based on the conduct of any real estate brokerage acquired by EXIT Realty after the Execution Date or any other Person affiliated with such an acquired brokerage that becomes affiliated with EXIT Realty after the Execution Date for conduct which took place before the Execution Date.

13.    "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past,

95716\324308772.v1

present or future officers, directors, members, shareholders, managers, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

14.    "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

15.    "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019 and date of Class Notice.  For avoidance of doubt, Plaintiffs and EXIT Realty intend this Settlement Agreement to provide for a nationwide settlement class with a nationwide settlement and release.

16.    "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

17.    "Settling Parties" means Plaintiffs and EXIT Realty.

18.    "Total Monetary Settlement Amount" means $1,500,000 (One Million Five-Hundred Thousand Dollars) in United States currency.  All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount, and EXIT Realty will pay nothing apart from the Total Monetary Settlement Amount.

19.    "Umpa" means Western District of Missouri Case No. 4:23-cv-00945, which is currently pending, and which has now been consolidated with Gibson.

7

95716\324308772.v1

**B.**     <u>Stipulation to Class Certification</u>

20.     The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to EXIT Realty. The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only. Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

21.     Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by EXIT Realty that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**C.**     <u>Approval of this Settlement Agreement and Dismissal of the Actions</u>

22.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e); scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to EXIT Realty; and EXIT Realty's cooperation by providing information reflecting its ability to pay limitations and, if requested by Co-Lead Counsel, a declaration describing and attesting to those limitations. The Parties will notify the Court of the Settlement and stipulate to immediately stay the Actions as to EXIT Realty, subject to the approval of the Court, pending a final decision on settlement approval.

8

95716\324308772.v1

23.     Plaintiffs will submit to the Court at a time of their choosing, subject to direction by the Court, a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). The Motion shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement. The proposed form of the preliminary approval order shall be acceptable to EXIT Realty provided that it is substantially in the form of the orders proposed in connection with the Compass settlement. At least two (2) business days before submission to the Court, the proposed papers in support of the Motion for preliminary approval shall be provided by Co-Lead Counsel to EXIT Realty for its review. To the extent that EXIT Realty objects to any aspect of the Motion, it shall communicate such objection to Co-Lead Counsel and the Settling Parties shall meet and confer to resolve any such objection. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of a mutually agreed upon mediator and will endeavor to resolve any issues to the satisfaction of the Court.

24.     The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement of any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets that meet the requirements of due process and Federal Rule of Civil Procedure 23. The Settling Parties agree that the form of notice shall not be subject to EXIT Realty's review or approval so long as it is substantially in the form of the Court-approved notice of the Compass settlement. To the extent Plaintiffs seek to vary the form of notice, EXIT Realty must provide any edits or objections within two (2) business days, and the Settling Parties shall promptly meet and confer to resolve any such objection. The Settling Parties agree to the use JND as a claims

9

95716\324308772.v1

and notice administrator. The timing of any request to disseminate notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

25. Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, shall at EXIT Realty's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Actions Fairness Act, 28 U.S.C. § 1715.

26. If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to EXIT Realty:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to EXIT Realty only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to EXIT Realty.

27. This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

10

95716\324308772.v1

**D. Releases, Discharge, and Covenant Not to Sue**

28.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of Actions, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims.  The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes.  In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

29.     The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal with Prejudice in the Actions shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ.

11

Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES
> NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
> FAVOR AT THE TIME OF EXECUTING THE RELEASE
> AND THAT, IF KNOWN BY HIM OR HER, WOULD
> HAVE MATERIALLY AFFECTED HIS OR HER
> SETTLEMENT WITH THE DEBTOR OR RELEASED
> PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Agreement.

30.     The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Actions), a

12

95716324308772.v1

claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in this Actions.

**E.**   **Payment of the Settlement Amount**

31.   Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). Within 30 days of Court preliminary approval of this settlement, EXIT Realty will deposit $495,000 into the qualified settlement fund. By August 31, 2026, EXIT Realty will deposit an additional $335,000 into the qualified settlement fund. By August 31, 2027, EXIT Realty will deposit an additional $335,000 into the qualified settlement fund. By May 31, 2028, EXIT Realty will deposit the final $335,000 into the qualified settlement fund. All accrued interest shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of EXIT Realty.

**F.**   **The Settlement Fund**

32.   The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of

13

95716\324308772.v1

the Settlement Fund.  In no event will EXIT Realty's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

33.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement except as provided in Paragraph 52.  Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval.  The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court.  The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

34.     After preliminary approval of the Settlement and approval of a class notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class.  EXIT Realty will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $160,000 to pay the costs for notice.  If Plaintiffs settle with one (or more) Non-EXIT Realty Corporate Defendants and notice of one or more other settlements is included in the notice of the EXIT Realty settlement, then the cost of such notice will be apportioned equitably between (or among) the EXIT Realty Settlement Fund and the other settling Defendant(s)' settlement funds.  The amount spent or accrued for notice and notice administration costs is not refundable to EXIT Realty in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become Effective.

35.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund.  Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or

14

95716\324308772.v1

class representative incentive awards, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

36.     The Settlement Fund will be invested in United States Government Treasury obligations, United States Treasury money market funds, or FDIC insured Interest-bearing accounts.

37.     EXIT Realty will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement. EXIT Realty's only payment obligation is to pay the Total Monetary Settlement Amount.

38.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers. The Settlement will be non-reversionary except as set forth below in Section H. If the Settlement becomes Effective, no proceeds from the Settlement will revert to EXIT Realty regardless of the claims that are made.

39.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 34 and 35 above and 42 below.

40.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. EXIT Realty will have no participatory or approval rights with respect to the Plan of Allocation. It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an

15

95716\324308772.v1

authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement. The Settlement Class, Plaintiffs, and EXIT Realty shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

41. The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against EXIT Realty or the Released Parties.

## G.   Taxes

42. Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. EXIT Realty has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to EXIT Realty. In the event the Settlement does not become Effective and any funds including interest or other income are returned to EXIT Realty, EXIT Realty will be responsible for the payment of all taxes (including any interest or

16

95716\324308772.v1

penalties), if any, on said interest or other income. EXIT Realty makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**H.** **Rescission**

43.     If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if such approval is modified in or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by EXIT Realty or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order.

44.     If the Settlement or Settlement Agreement is rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to EXIT Realty. In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to EXIT Realty. Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to EXIT Realty.

45.     If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their

17

respective positions in the Actions as of February 14, 2025. Plaintiffs and EXIT Realty agree that any rulings or judgments that occur in the Actions on or after February 14, 2025 and before this Settlement Agreement is rescinded will not bind Plaintiffs, EXIT Realty or any of the Released Parties. Plaintiffs and EXIT Realty agree to waive any argument of claim or issue preclusion against Plaintiffs or EXIT Realty arising from such rulings or judgments. In the event of rescission, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. EXIT Realty and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by EXIT Realty or the Plaintiffs. The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from February 14, 2025, until the date this Settlement or Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

46.     EXIT Realty warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the Execution Date, and, will warrant and represent, that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Settlement Amount are actually transferred or made. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Settlement Amount, or any portion thereof, by or on behalf of EXIT Realty to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of EXIT Realty, then, at the election of Plaintiff counsel, the settlement may be terminated and the releases given and the

18

95716\324308772.v1

judgment entered pursuant to the Settlement shall be null and void.

47. The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

48. EXIT Realty reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

## I. Practice Changes

49. As soon as practicable, and in no event later than six months after the Effective Date, EXIT Realty (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will implement, or, to the extent already implemented, will maintain the following practice changes:

   i. advise and periodically remind EXIT Realty's company-owned brokerages, franchisees (if any), and their agents that there is no EXIT Realty requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;

   ii. require that any EXIT Realty company-owned brokerages and their agents (and recommend and encourage that any EXIT Realty franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing

agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then EXIT Realty will require that any company-owned brokerages and their agents (and recommend and encourage that any EXIT Realty franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii.     prohibit all EXIT Realty company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that EXIT Realty franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv.     require that EXIT Realty owned brokerages and their agents disclose to their clients at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

v.     prohibit EXIT Realty owned brokerages and their agents (and recommend and encourage that any EXIT Realty franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.     advise and periodically remind EXIT Realty company owned brokerages and their agents of their obligation to (and recommend and encourage that any EXIT Realty franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives

20

95716\324308772.v1

provided that each such property meets the buyer's articulated purchasing priorities;

vii.    for each of the above points, for company owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

50.    If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 49 will sunset 5 years after the Effective Date.

51.    EXIT Realty acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its best efforts to implement, or, to the extent already implemented, to maintain the practices specified in this Section.

## J.  <u>Cooperation</u>

52.    EXIT Realty (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will provide valuable cooperation to Plaintiffs as follows in the Actions, including to the extent that it is consolidated in an MDL, including but not limited to the following. Any disputes regarding the scope of these provisions or compliance with these provisions can be referred to a mediator, mutually chosen by the parties, for binding resolution. Any documents produced under this section shall be governed by the Protective Order on file in this lawsuit and may only be used in the Actions, as provided therein.

i.    EXIT Realty will use reasonable best efforts to produce relevant summary-level, companywide transactional data limited to the class period. This data will be aggregated on a quarterly basis and will provide transactional volume, transactional value, and commissions paid on a state by state basis, as reported by the franchisees. The data will be sufficient to show volume of commerce and the

21

95716\324308772.v1

average commission percentage. The data will be produced at a similar time to when other Defendants produce transactional data in *Gibson* and *Umpa*.

ii.  EXIT Realty will produce documents sufficient to show its and its officers, employees, and agents' membership and participation in NAR, that it was subject to, and whether EXIT Realty complied with the challenged NAR rules during the class period, including whether and how EXIT Realty accepted, adopted and implemented the challenged NAR rules.

iii. EXIT Realty will provide up to seven hours of 30(b)(6) testimony and up to seven hours of 30(b)(1) testimony across no more than two 30(b)(1) witnesses. The time only includes Plaintiff questioning and does not include questioning by any other party. EXIT Realty will make one, mutually agreed upon, witness available at trial, as necessary, and provide access via counsel to that witness prior to trial testimony for up to two (2) hours.

iv.  EXIT Realty will use reasonable best efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

v.  EXIT Realty will use reasonable best efforts to provide the facts, assuming they are true, necessary to establish that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

22

95716\324308772.v1

vi.    EXIT Realty will use reasonable best efforts at its expense to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

vii.    if another Defendant includes a witness on a witness list who is then a current officer or employee of EXIT Realty or its subsidiaries, EXIT Realty will cooperate in providing access via counsel to that witness prior to trial testimony;

viii.    EXIT Realty agrees not to provide greater assistance in discovery or trial to any defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

53.    EXIT Realty's cooperation obligations, as set forth in Paragraph 52, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

54.    EXIT Realty's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to EXIT Realty. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-EXIT Realty Defendants and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

55.    EXIT Realty acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its reasonable best efforts to provide the cooperation

23

95716\324308772.v1

specified in this Section.

**K. Miscellaneous**

56.    This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party. EXIT Realty denies the material allegations of the complaints in the Actions. Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by EXIT Realty, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by EXIT Realty in any proceeding.

57.    This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations. The Settling Parties reached the Settlement Agreement after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation. The terms of the settlement must be kept strictly confidential until a motion for preliminary approval is filed—except as necessary for EXIT Realty to meet its financial reporting obligations and as required by law.

58.    Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.

59.    This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-EXIT Realty Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties. All rights of any Settlement Class Member against any Non-EXIT Realty Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

24

95716\324308772.v1

60. This Settlement Agreement constitutes the entire agreement among Plaintiffs and EXIT Realty pertaining to the Settlement of the Actions against EXIT Realty. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and EXIT Realty.

61. This Settlement Agreement may be executed in counterparts by Plaintiffs and EXIT Realty, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

62. Neither Plaintiffs nor EXIT Realty shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

63. The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

64. The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

65. The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

66. Any disputes between EXIT Realty and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented to a mutually acceptable mediator agreed to by the Parties for assistance in mediating a resolution.

67. Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling

25

95716\324308772.v1

Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

68. Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

26

95716\324308772.v1

CO-LEAD COUNSEL

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

_____
Boulware Law LLC

_____
Williams Dirks Dameron LLC

_____

EXIT Realty Corp.-International

By: _____

EXIT Realty Corp.-USA

By: _____

27

95716\324308772.v1

## APPENDIX A

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

|  |  |
|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, individually and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et. al.<br><br>    Defendants. | Case No. 4:23-CV-788-SRB<br><br>[Consolidated with 4:23-cv-00945-SRB]<br><br>Hon. Stephen R. Bough |

Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa ("Plaintiffs") and Defendant EXIT Realty Corp. International and EXIT Realty Corp.-USA (collectively, "EXIT Realty") (collectively, "the Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, each firm defined in the Settlement Agreement as Co-Lead Counsel desires to give an undertaking (the "Undertaking") for repayment of the award of attorneys' fees, costs, and expenses approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

28

95716\324308772.v1

NOW, THEREFORE, the undersigned counsel, individually and as agent for his/her law firm, hereby submits both to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Settlement Agreement.

By receiving any payments pursuant to the Settlement Agreement, Co-Lead Counsel and their shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Western District of Missouri for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to EXIT Realty, based upon written instructions provided by EXIT Realty, the full amount of the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund, including any accrued interest.

In the event the Settlement Agreement becomes Effective, but the attorneys' fees, costs, and expenses awarded by the Court or any part of them are vacated, overturned, modified, reversed, or rendered void as a result of an appeal, Co-Lead Counsel shall within thirty (30) days repay to the Settlement Fund, based upon written instructions provided by the settlement administrator, the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the final settlement order and judgment pertaining to attorneys' fees, such that the finality of those fees no longer remains in doubt.

95716\324308772.v1

In the event Co-Lead Counsel fails to repay to EXIT Realty any of attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court shall, upon application of EXIT Realty, and notice to Co-Lead Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Co-Lead Counsel.

The undersigned stipulate, warrant, and represent that they have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of each firm identified as Co-Lead Counsel. This agreement will only be effective upon its execution by each firm identified in the Settlement Agreement as Co-Lead Counsel.

Co-Lead Counsel acknowledge that this Undertaking is a material component of the Settlement Agreement and agree to use its reasonable efforts to timely effect the terms specified in this Undertaking. Each undersigned warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Undertaking is executed.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:

_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


30

95716\324308772.v1

_Marc Seltzer_

Susman Godfrey LLP

_[signature]_

Ketchmark & McCreight PC

_[signature]_

Boulware Law LLC

_[signature]_

Williams Dirks Dameron LLC

Hinshaw & Culbertson LLP

31

95716\324308772.v1

_____
Susman Godfrey LLP


_____
Ketchmark & McCreight PC


_____
Boulware Law LLC


_____
Williams Dirks Dameron LLC

_____
Hinshaw & Culbertson LLP

31

# Exhibit D

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

DON GIBSON, LAUREN CRISS, JOHN MEINERS, and
DANIEL UMPA, individually and on behalf of themselves and
all others similarly situated,

        Plaintiffs,

   v.

THE NATIONAL ASSOCIATION OF REALTORS, et. al.

        Defendants.

Case No. 4:23-cv-00788-SRB

[Consolidated with
4:23-cv-00945-SRB]

Hon. Stephen R. Bough

**SETTLEMENT AGREEMENT**

This Settlement Agreement ("Settlement Agreement") is made and entered into this 21st day of May, 2025 (the "Execution Date"), by and between each of Defendants Windermere Real Estate Services Company, Inc. ("Windermere") and William L Lyon & Associates, Inc. ("Lyon") and Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa, who filed suit in the above captioned actions (now consolidated) both individually and as a representative of the Settlement Class, as defined below.

WHEREAS, in the Actions Plaintiffs allege that Windermere and Lyon participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act;

WHEREAS, Windermere and Lyon deny Plaintiffs' allegations in the Actions and have asserted defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for Windermere and Co-Lead Counsel and counsel for Lyon leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-Windermere and Non-Lyon Defendants unless Plaintiffs separately settle with any of the Non-Windermere and Non-Lyon Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, and have concluded that settlements with Windermere and Lyon according to the terms set forth below are fair, reasonable, adequate, and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, neither Windermere nor Lyon believe that it is liable for the claims asserted, and each believes that it has good defenses to Plaintiffs' claims and meritorious pre-trial and post-trial motions, but nevertheless have decided to enter into this Settlement Agreement to avoid further

expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, Windermere and Lyon, in addition to the settlement payments set forth below, have each agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between each of Windermere and Lyon and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to Windermere and as to Lyon only, without costs to Plaintiffs, the Settlement Class, Windermere or Lyon except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

A.   **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.      "Actions" means Gibson v. NAR, (W.D. Mo. Case No. 4:23-cv-00788-SRB) and Umpa v. NAR, (W.D. Mo. Case No. 4:23-cv-945-SRB).

2.      "Corporate Defendants" means any defendant aside from the National Association of Realtors named in Umpa v. NAR, (W.D. Mo. Case No. 4:23-cv-945-SRB), Gibson v. NAR, (W.D. Mo. Case No. 4:23-cv-00788-SRB), Burnett v. NAR, (W.D. Mo. Case No. 19-cv-00332-SRB), or Moehrl v. NAR, (N.D. Ill. Case No. 1:19-cv-01610).

3.      "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

3

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101

4. "Court" means the U.S. District Court for the Western District of Missouri.

5. "Defendants" means Windermere, Lyon, and all defendants named in either Gibson or Umpa.

6. "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

7. "Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against Windermere and Lyon with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-Windermere and Non-Lyon Defendant or any

4

person or entity related to the Non-Windermere and Non-Lyon Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

8.     "Gibson" means Western District of Missouri Case No. 4:23-cv-00788, which is currently pending and which has been consolidated with Umpa, Case No. 4:23-cv-00945.

9.     "Opt-Out Sellers" means members of the Settlement Class who have timely exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

10.     "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates, and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

11.     "Released Claims" means any and all manner of federal and state claims regardless of the cause of Actions arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

12.     "Released Parties" means Windermere, Lyon, and all of each's respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to

5

the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, sub-franchisors, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' and sub-franchisors' officers, directors, managing directors, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-Windermere and Non-Lyon Corporate Defendants, or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the Windermere or Lyon entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with Windermere or Lyon and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release Windermere, Lyon, or any other Person for any claims based on the conduct of any real estate brokerage acquired by Windermere, Lyon, or any other Person affiliated with such an acquired brokerage that becomes affiliated with Windermere or Lyon after the Execution Date for conduct which took place before the Execution Date.

6

13.     "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

14.     "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

15.     "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019 and date of Class Notice.  For avoidance of doubt, Plaintiffs and Windermere and Lyon intend this Settlement Agreement to provide for a nationwide settlement class with a nationwide settlement and release.

16.     "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

17.     "Settling Parties" means Plaintiffs, Windermere, and Lyon.

18.     "Total Monetary Settlement Amount" means $2,100,000 (Two Million One-Hundred Thousand Dollars) in United States currency.  All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount,

7

and neither Windermere nor Lyon shall pay anything apart from its respective portion of the Total Monetary Settlement Amount.

19.     "Umpa" means Western District of Missouri Case No. 4:23-cv-00945, which is currently pending, and which has now been consolidated with Gibson.

**B.      Stipulation to Class Certification**

20.     The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Windermere and Lyon.  The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only.  Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

21.     Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by Windermere or Lyon that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**C.      Approval of this Settlement Agreement and Dismissal of the Actions**

22.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e); scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to Windermere and Lyon; and Windermere and Lyon each cooperating by each providing information reflecting its ability to pay limitations and, if requested by Co-Lead Counsel, a

8

declaration describing and attesting to those limitations. The Parties will notify the Court of the Settlement and stipulate to immediately stay the Actions as to Windermere and Lyon, subject to the approval of the Court, pending a final decision on settlement approval.

23.     Plaintiffs will submit to the Court at a time of their choosing, subject to direction by the Court, a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). The Motion shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement. The proposed form of the preliminary approval order shall be acceptable to Windermere and Lyon provided that it is substantially in the form of the orders proposed in connection with the Compass settlement. At least 24 hours before submission to the Court, the papers in support of the Motion for preliminary approval shall be provided by Co-Lead Counsel to each of Windermere and Lyon for its review. To the extent that Windermere or Lyon objects to any aspect of the Motion, the objecting party shall communicate such objection to Co-Lead Counsel and the Settling Parties shall meet and confer to resolve any such objection. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of mediator Greg Lindstrom or another agreed mediator, and will endeavor to resolve any issues to the satisfaction of the Court.

24.     The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement of any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets the requirements of due process and Federal Rule of Civil Procedure 23. The Settling Parties agree that the form of notice shall not be subject to Windermere

9

or Lyon's review or approval so long as it is substantially in the form of the Court-approved notice of the Compass settlement. To the extent Plaintiffs seek to vary the form of notice, Windermere and Lyon must each provide any edits or objections within 24 hours, and the Settling Parties shall promptly meet and confer to resolve any such objection. The Settling Parties agree to the use JND as a claims and notice administrator. The timing of any request to disseminate notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

25. Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, shall at Windermere and Lyon's expense, to be credited against the Total Monetary Settlement Amount, cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Actions Fairness Act, 28 U.S.C. § 1715.

26. If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to Windermere and Lyon:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to Windermere and Lyon only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to Windermere and Lyon.

27. This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

**D. Releases, Discharge, and Covenant Not to Sue**

28. Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release each of the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of Actions, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

29. The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon

11

the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Agreement.

30.    The Releasing Parties intend by this Settlement Agreement to settle with and release

only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in this Actions.

**E.**     **Payment of the Settlement Amount**

31.    Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). Within 30 days of preliminary court approval of this Settlement Agreement, Windermere will deposit $300,000 into the qualified settlement fund. By June 1, 2026, Windermere will deposit an additional $750,000 into the qualified settlement fund. By June 1, 2027, Windermere will deposit an additional $750,000 into the qualified settlement fund. All accrued interest on Windermere's payments shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of Windermere.

Within 30 days of preliminary court approval of this Settlement Agreement, Lyon will deposit $150,000 into the qualified settlement fund. By June 1, 2026, Lyon will deposit an additional $150,000 into the qualified settlement fund. All accrued interest on Lyon's payments shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of Lyon. Windermere shall not be responsible for Lyon's financial or other obligations under this Settlement Agreement and a breach of this Settlement Agreement by Lyon

13

shall not constitute a breach by Windermere or otherwise affect Windermere's rights or obligations hereunder. Lyon shall not be responsible for Windermere's financial or other obligations under this Settlement Agreement and a breach of this Settlement Agreement by Windermere shall not constitute a breach by Lyon or otherwise affect Lyon's rights or obligations hereunder.

**F.**     **The Settlement Fund**

32.     The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund."  The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund.  In no event will Windermere and Lyon's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

33.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement except as provided in Paragraph 52.  Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval.  The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court.  The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

34.     After preliminary approval of the Settlement and approval of a class notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class.  Windermere will not object to Plaintiffs' counsel withdrawing from its payments into the Settlement Fund, subject to any necessary Court approval,

of up to $300,000 to pay the costs for notice. Lyon will not object to Plaintiffs' counsel withdrawing from its payments into the Settlement Fund the Settlement Fund, subject to any necessary Court approval, of up to $75,000 to pay the costs for notice. If Plaintiffs settle with one (or more) Non-Windermere and Non-Lyon Corporate Defendants and notice of one or more other settlements is included in the notice of the Windermere and Lyon settlement, then the cost of such notice will be apportioned equitably between (or among) the Windermere and Lyon Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for notice and notice administration costs is not refundable to Windermere or Lyon in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become Effective.

35. Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund. Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or class representative incentive awards, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

36. The Settlement Fund will be invested in United States Government Treasury obligations, United States Treasury money market funds, or FDIC insured Interest-bearing accounts.

37. Windermere and Lyon will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the

Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement. Windermere's only payment obligation is to pay its portion of the Total Monetary Settlement Amount, and Lyon's only payment obligation is to pay its portion of the Total Monetary Settlement Amount.

38.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers. The Settlement will be non-reversionary except as set forth below in Section H. If the Settlement becomes Effective, no proceeds from the Settlement will revert to Windermere or Lyon regardless of the claims that are made.

39.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 34 and 35 above and 42 below.

40.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. Neither Windermere nor Lyon will have any participatory or approval rights with respect to the Plan of Allocation. It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement. The Settlement Class, Plaintiffs, Windermere, and Lyon shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

41.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against Windermere, Lyon, or the Released Parties.

**G.     Taxes**

42.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund.  All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund.  Neither Windermere nor Lyon has any responsibility to make any filings relating to the Settlement Fund, and neither will have any responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to Windermere and Lyon according to their proportional contributions.  In the event the Settlement does not become Effective and any funds including interest or other income are returned to Windermere and Lyon, Windermere and Lyon will each be responsible for the payment of all taxes (including any interest or penalties), if any, on its respective portion said interest or other income.  Neither Windermere nor Lyon makes any representations regarding, nor has any responsibility for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**H.     Rescission**

43.     If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if

such approval is modified or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by Windermere or Lyon or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order.

44.     If the Settlement or Settlement Agreement is rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to Windermere and Lyon, according to their respective contributions.  In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to Windermere or Lyon.  Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to Windermere or Lyon.

45.     If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions in the Actions as of February 14, 2025.  Plaintiffs, Windermere, and Lyon agree that any rulings or judgments that occur in the Actions on or after February 14, 2025, and before this Settlement Agreement is rescinded will not bind Plaintiffs, Windermere, or Lyon or any of the Released Parties.  Plaintiffs, Windermere, and Lyon agree to waive any argument of claim or issue preclusion against Plaintiffs, Windermere, or Lyon arising from such rulings or judgments.  In the

event of rescission, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. Windermere, Lyon, and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by Windermere, Lyon, or the Plaintiffs. The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from February 14, 2025, until the date this Settlement or Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

46. Windermere warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the Execution Date, and will warrant and represent, that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Settlement Amount are actually transferred or made. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of its portion of the Settlement Amount, or any portion thereof, by or on behalf of Windermere to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Windermere, then, at the election of Plaintiff counsel, the settlement as to Windermere may be terminated, and the releases given and the judgment entered as to Windermere pursuant to the Settlement shall be null and void. Such election by Plaintiffs counsel shall not impact, impair, or otherwise affect Lyon's rights and obligations under the Settlement, which shall remain in full force and effect.

Lyon warrants and represents that it is not "insolvent" within the meaning of applicable

bankruptcy laws as of the Execution Date, and will warrant and represent, that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Settlement Amount are actually transferred or made. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of its portion of the Settlement Amount, or any portion thereof, by or on behalf of Lyon to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Lyon, then, at the election of Plaintiff counsel, the settlement as to Lyon may be terminated, and the releases given and the judgment entered as to Lyon pursuant to the Settlement shall be null and void. Such election by Plaintiffs counsel shall not impact, impair, or otherwise affect Windermere's rights and obligations under the Settlement, which shall remain in full force and effect.

47.     The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

48.     Windermere and Lyon each reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

**I.  Practice Changes**

49.     As soon as practicable, and in no event later than six months after the Effective Date, Windermere and Lyon (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will each implement, or, to the extent already implemented, will maintain the following practice changes (with regard to only its own respective brokerages and/or franchisees):

   i.     advise and periodically remind its company-owned brokerages, franchisees (if any), and their agents that there is no Windermere or Lyon requirement that they

must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;

ii. require that any Windermere or Lyon company-owned brokerages and its agents (and recommend and encourage that any Windermere or Lyon franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then Windermere or Lyon will require that any company-owned brokerages and their agents (and recommend and encourage that any Windermere or Lyon franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii. prohibit all Windermere or Lyon company-owned brokerages and their agents (if any) acting as buyer representatives (and recommend and encourage that Windermere or Lyon franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv. require that Windermere or Lyon owned brokerages and their agents (if any) disclose to their clients at the earliest moment possible any offer of compensation made in connection with each home marketed to prospective buyers in any format;

v.     prohibit its owned brokerages and their agents from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices) as well as recommend and encourage that any of its franchisees and their agents do the same;

vi.     advise and periodically remind Windermere or Lyon company owned brokerages and their agents (if any) of their obligation to (and recommend and encourage that any Windermere or Lyon franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii.     for each of the above points, for company owned brokerages (if any), franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

50.     If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 49 will sunset 5 years after the Effective Date.

51.     Windermere and Lyon each acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its best efforts to implement, or, to the extent already implemented, to maintain the practices specified in this Section.

## J.  Cooperation

52.     Windermere and Lyon (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and

successors but not franchisees) will each provide valuable cooperation to Plaintiffs as follows in the Actions, including to the extent that it is consolidated in an MDL, including but not limited to the following. Any disputes regarding the scope of these provisions or compliance with these provisions can be referred to Greg Lindstrom or another mediator, mutually chosen by the parties, for binding resolution.

     i.    Lyon and Windermere will each use reasonable best efforts to produce relevant summary-level, company-wide transactional data limited to the class period to the extent this information is in each's possession, custody, or control. This data will be aggregated on a quarterly basis and will provide transactional volume, transactional value, and commissions paid on a state by state basis. The data will be sufficient to show volume of commerce and the average commission percentage. The data will be produced at a similar time to when other Defendants produce transactional data in *Gibson* and *Umpa*. Windermere asserts that it is a franchising entity and not a brokerage and therefore may not be able to reasonably access all of the transactional data requested.

    ii.    Windermere and Lyon will each produce documents sufficient to show its and its officers, employees, and agents' membership and participation in NAR (if any), that they were subject to and whether they complied with the challenged NAR rules during the class period (but only to the extent each was actually subject to NAR rules), including whether and how they accepted, adopted and implemented the challenged NAR rules.

    iii.    Windermere and Lyon will each provide up to seven hours of 30(b)(6) testimony and up to seven hours of 30(b)(1) testimony across no more than two 30(b)(1) witnesses. The time only includes Plaintiff questioning and does not include

questioning by any other party. Windermere and Lyon will each make one, mutually agreed upon, witness available at trial, as necessary, and provide access via counsel to that witness prior to trial testimony for up to two (2) hours.

iv.    Windermere will use reasonable best efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary. Lyon will use reasonable best efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

v.    Windermere will use reasonable best efforts to provide the facts, assuming they are true, necessary to establish that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary. Lyon will use reasonable best efforts to provide the facts, assuming they are true, necessary to establish that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

vi.    Lyon and Windermere will each use reasonable best efforts at their expense to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or

the litigation of the Actions to the extent this information is in each's possession, custody, or control. Windermere asserts that it is not a brokerage and therefore does not have custody, control, possession, or direct knowledge of class member or listing data, but will use reasonable best efforts to provide such information where possible.

vii.    if another Defendant includes a witness on a witness list who is then a current officer or employee of Windermere and/or Lyon or their subsidiaries, Windermere and/or Lyon respectively will cooperate in providing access via counsel to that witness prior to trial testimony;

viii.    Windermere and Lyon each agrees to not provide greater assistance in discovery or trial to any defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

53.    Windermere and Lyon's separate cooperation obligations, as set forth in Paragraph 52, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

54.    Windermere and Lyon's separate obligations to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to each of Windermere and Lyon. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligations to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-Windermere and non-Lyon Defendants and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal

25

or review.

55.    Windermere and Lyon each acknowledges that its cooperation set forth here is a material component of this Settlement Agreement and agree to use its reasonable best efforts to provide the cooperation specified in this Section.

**K.  Miscellaneous**

56.    This Settlement Agreement and any Actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party.  Windermere and Lyon each deny the material allegations of the complaints in the Actions.  Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Windermere or Lyon, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by Windermere or Lyon in any proceeding.

57.    This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations. The Settling Parties reached the Settlement Agreement after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation.  The terms of the settlement must be kept strictly confidential until a motion for preliminary approval is filed—except as necessary for Windermere and Lyon to meet each's separate financial reporting obligations and as required by law.

58.    Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.

59.    This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-Windermere and Non-Lyon Defendant or

26

(b) any alleged co-conspirator or other person or entity other than the Released Parties. All rights of any Settlement Class Member against any Non-Windermere and Non-Lyon Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

60.     This Settlement Agreement constitutes the entire agreement between Plaintiffs and Windermere and Plaintiffs and Lyon pertaining to the Settlement of the Actions against Windermere and Lyon respectively. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs, Windermere, and Lyon.

61.     This Settlement Agreement may be executed in counterparts by Plaintiffs, Windermere, and Lyon, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

62.     None of the Parties shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

63.     The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

64.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

65.     The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and each of the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

66.     Any disputes among Plaintiffs, Co-Lead Counsel, Windermere and/or Lyon concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be

27

presented to Greg Lindstrom or another mediator agreed to by the Parties for assistance in mediating a resolution.

67.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will.  Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

68.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

CO-LEAD COUNSEL

_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

_____

Boulware Law LLC


_____

Williams Dirks Dameron LLC


_____     PATRICK M SHEA

William L. Lyon & Associates, Inc.


_____

Windermere Real Estate Services Company, Inc.

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| DON GIBSON, LAUREN CRISS, JOHN MEINERS, and DANIEL UMPA, individually and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, et. al.<br><br>        Defendants. | Case No. 4:23-CV-788-SRB<br><br>[Consolidated with 4:23-cv-00945-SRB]<br><br>Hon. Stephen R. Bough |

Plaintiffs Don Gibson, Lauren Criss, John Meiners, and Daniel Umpa ("Plaintiffs") and Defendants Windermere Real Estate Services Company, Inc. ("Windermere") and William L. Lyon & Associates, Inc. ("Lyon") (collectively, "the Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, each firm defined in the Settlement Agreement as Co-Lead Counsel desires to give an undertaking (the "Undertaking") for repayment of the award of attorneys' fees, costs, and expenses approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned counsel, individually and as agent for his/her law firm, hereby submits both to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Settlement Agreement.

By receiving any payments pursuant to the Settlement Agreement, Co-Lead Counsel and their shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Western District of Missouri for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to Windermere and Lyon, based upon written instructions provided by Windermere and Lyon respectively, the full amount of the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund, including any accrued interest.

In the event the Settlement Agreement becomes Effective, but the attorneys' fees, costs, and expenses awarded by the Court or any part of them are vacated, overturned, modified, reversed, or rendered void as a result of an appeal, Co-Lead Counsel shall within thirty (30) days repay to the Settlement Fund, based upon written instructions provided by the settlement administrator, the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the final settlement order and judgment pertaining to attorneys' fees, such that the finality of those fees no longer remains in doubt.

In the event Co-Lead Counsel fails to repay to Windermere or Lyon any of attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court shall, upon application of

31

Windermere or Lyon, and notice to Co-Lead Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Co-Lead Counsel.

The undersigned stipulate, warrant, and represent that they have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of each firm identified as Co-Lead Counsel. This agreement will only be effective upon its execution by each firm identified in the Settlement Agreement as Co-Lead Counsel.

Co-Lead Counsel acknowledge that this Undertaking is a material component of the Settlement Agreement and agree to use its reasonable efforts to timely effect the terms specified in this Undertaking. Each undersigned warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Undertaking is executed.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

32

Ketchmark & McCreight PC

Boulware Law LLC

Williams Dirks Dameron LLC

~ PATRICK M. SHEA PRESIDENT

William L. Lyon & Associates, Inc.

Windermere Real Estate Services Company, Inc.

33

# Exhibit E

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into as of the last date of signature (the "Execution Date"), and is by and between West USA Realty, Inc. ("West USA") and Plaintiffs Daniel Umpa, Don Gibson, and Joseph Masiello (collectively "Plaintiffs"), who filed suit in *Daniel Umpa v. The National Association of Realtors, et al.*, No. 23-cv-945 (W.D. Mo.), *Don Gibson v. The National Association of Realtors, et al*., No. 23-cv-00788 (W.D. Mo.), and *Joseph Masiello v. Arizona Association of Realtors, et al.*, No. 24-cv-00045 (D. Ariz.), and any forthcoming case as identified in Paragraph 19 below (all three actions collectively, "the Actions"), both individually and as representatives of one or more classes of home sellers.

WHEREAS, West USA denies Plaintiffs' allegations in the Actions and indicated it would assert defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for West USA leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-West USA Defendants unless Plaintiffs separately settle with any of the Non-West USA Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, and have concluded that a settlement with West USA according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, West USA believes that it is not liable for any claims asserted and has good defenses to Plaintiffs' claims, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement,

1

and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, West USA in addition to the settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between West USA and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to West USA only, without costs to Plaintiffs, the Settlement Class, or West USA except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

A.      **<u>Definitions</u>**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.      "Corporate Defendants" means any defendant aside from the National Association of Realtors named in *Gibson, Umpa, Burnett v. NAR*, (W.D. Mo. Case No. 19-CV-0332-SRB), *Moehrl v. NAR*, (N.D. Ill. Case No. 1:19-cv-01610), or *Joseph Masiello v. Arizona Association of Realtors, et al.*, No. 24-cv-00045 (D. Ariz.).

2.      "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000

2

Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067

With respect to this Settlement only, Co-Lead Counsel also means:

ZIMMERMAN REED LLP
14648 North Scottsdale Road, Suite 130
Scottsdale, AZ 85254

3.      "Court" means the U.S. District Court for the Western District of Missouri.

4.      "Defendants" all defendants named in the Actions.

5.      "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

6.      "Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against West USA with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-West USA Defendant or any person or entity related to the Non-West USA Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal with respect to

3

this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

7.     "Gibson" means Western District of Missouri Case No. 4:19-cv-00332-SRB, which is currently pending.

8.     "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

9.     "Masiello" means Arizona District Court Case No. 24-cv-00045-DLR, which is currently pending.

10.    "Released Claims" means any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

11.    "Released Parties" means West USA and all of its respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, sub-franchisors, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' and sub-franchisors' officers, directors, managing directors, employees, agents, and

independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-West USA Corporate Defendants or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the West USA Entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with West USA and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release West USA or any other Person for any claims based on the conduct of any real estate brokerage acquired by West USA or any other Person who becomes affiliated with West USA after the Execution Date for conduct which took place before the Execution Date.

12. "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

5

13.     "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

14.     "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019, and date of Class Notice. For avoidance of doubt, Plaintiffs and West USA intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release.

15.     "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

16.     "Settling Parties" means Plaintiffs and West USA.

17.     "Total Monetary Settlement Amount" means Nine Hundred Fifty-Thousand DOLLARS ($950,000) in United States currency. All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount, and West USA will pay nothing apart from the Total Monetary Settlement Amount.

18.     "Umpa" means Western District of Missouri Case No. 23-cv-00945, which is currently pending.

**B.      Stipulation to Class Certification for Settlement Purposes**

19.     West USA acknowledges and agrees that it will be named as a defendant in a new class action lawsuit arising from the same conspiracy alleged in *Burnett*, *Moehrl*, *Gibson*, *Umpa, and Masiello* (in which case, such new lawsuit will be included within the term "Actions"). The new lawsuit will be filed in the United States District Court for the Western District of Missouri, Western

Division. West USA agrees to (a) the jurisdiction and venue of the Western District of Missouri for purposes of this settlement only, (b) accept service for the new lawsuit, and (c) to the transfer of the new lawsuit to the court of Judge Stephen R. Bough, if it is not randomly assigned there. To the extent necessary, West USA hereby agrees to work in good faith with Plaintiffs and Co-Lead Counsel to efficiently and timely file the new action and have it transferred to Judge Bough's court. If any Party validly rescinds this Settlement Agreement for any reason, as provided in Paragraphs 43-49 below, then the Parties agree to seek dismissal of any claims against West USA in the new class action referenced in this Paragraph, and the plaintiffs in the *Masiello* case and West USA agree to resume litigation in the *Masiello* case in the United States District Court for the District of Arizona.

20.     The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to West USA. Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void. West USA and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by West USA or Plaintiffs, including, but not limited to, any defenses concerning the Court's lack of personal jurisdiction over West USA or any Released Parties. Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be construed as or deemed to be evidence of an admission or concession by West USA that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

7

21.    West USA hereby agrees that with respect to the Released Claims, any applicable statute of limitations or other time defenses shall be deemed tolled from the Execution Date until this Settlement Agreement is either finalized or rescinded.

**C.    Approval of this Settlement Agreement and Dismissal of the Actions**

22.    The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e) and scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to West USA.

23.    Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion").   The Motion shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement.  The proposed form of the preliminary approval order shall be acceptable to West USA provided that it is substantially in the form of the orders proposed in connection with the Keller Williams, Anywhere, and RE/MAX settlements. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement.  To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of mediator Hon. David Duncan and will endeavor to resolve any issues to the satisfaction of the Court.

24.    The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement with any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets the requirements of due process and Federal Rule of Civil

8

Procedure 23 ("Class Notice"). The Settling Parties agree that the notice language shall not be subject to West USA's review or approval so long as it is substantially in the form of one or more prior Court-approved notices. To the extent Plaintiffs seek to materially vary the language of the notice, they will promptly notify West USA in writing of any such changes, and West USA will provide any edits or objections within 48 hours, and the Settling Parties shall promptly meet and confer to resolve any such objection. The Settling Parties agree to the use JND as a claims and notice administrator. The timing of any request to disseminate Class Notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

25. Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, shall at West USA's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

26. If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to West USA:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to West USA only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and

9

consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) if applicable, determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to West USA.

27.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

**D.     <u>Releases, Discharge, and Covenant Not to Sue</u>**

28.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes.  In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims.  For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

29.     The Releasing Parties may hereafter discover facts other than or different from those

which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Agreement.

11

30.     The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions.

**E.      Payment of the Settlement Amount**

31.     Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). All accrued interest shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of West USA. West USA shall pay $950,000 within 30 days of preliminary approval. Time is of the essence as it relates to the timeliness of the settlement payment, and any failure to timely make any payment will constitute a material default under this Agreement.

**F.      The Settlement Fund**

32.     The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all

applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund. In no event will West USA's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

33.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

34.     Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class. West USA will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $237,500 to pay the costs for notice and administration. If Plaintiffs settle with one (or more) Non-West USA Corporate Defendants or newly-named brokerage defendants and notice of one or more other settlements is included in the notice of the West USA settlement, then the cost of such notice will be apportioned equitably between (or among) the West USA Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for notice and administration costs, up to $237,500, is not refundable to West USA in the event the Settlement Agreement does not become Effective or if it is rescinded by West USA or the Plaintiffs.

35.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund.

36.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

37.     West USA will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement. West USA's only payment obligation is to pay the Total Monetary Settlement Amount.

38.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers. The Settlement will be non-reversionary except as set forth below in Section H. If the Settlement becomes Effective, no proceeds from the Settlement will revert to West USA regardless of the claims that are made.

39.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 34 and 35 above and 43 below.

40.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. West USA will have no participatory or approval rights with respect to the Plan of Allocation. It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement. The Settlement Class, Plaintiffs, and West USA shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or

enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

41.    The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against West USA or the Released Parties.

**G.    Taxes**

42.    Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund.  All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund.  West USA has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to West USA.  In the event the Settlement does not become Effective and any funds including interest or other income are returned to West USA, West USA will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income.  West USA makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**H.    Rescission**

43.    If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if

such approval is modified in or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by West USA or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order.

44.     Within ten days of rescission pursuant to this Section, the *Masiello* Plaintiff and West USA agree to file a joint notice of rescission in the *Masiello* Case asking that the case resume, as to West USA, as if it were February 7, 2025.

45.     If the Settlement or Settlement Agreement is validly rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to West USA. In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to West USA. Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to West USA.

46.     If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions (in the *Masiello* Case only) as of the Execution Date.  Plaintiffs and West USA agree that any rulings or judgments that occur in the Actions on or after the date all parties sign this Settlement Agreement and before this Settlement Agreement is rescinded will not bind Plaintiffs,

West USA or any of the Released Parties. Plaintiffs and West USA agree to waive any argument of claim or issue preclusion against Plaintiffs or West USA arising from such rulings or judgments. In the event of rescission, the Actions will proceed only in the *Masiello* Case as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. West USA and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by West USA or the Plaintiffs. The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from February 7, 2025, until the date this Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

47.    West USA warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Settlement Agreement is executed and will warrant and represent that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Total Monetary Settlement Amount are actually transferred or made. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of West USA to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of West USA, then, at the election of Plaintiff counsel, the settlement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

48.     The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

49.     West USA reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

## I.  Practice Changes

50.     As soon as practicable, and in no event later than six months after the Effective Date, West USA (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will implement the following practice changes:

i.      advise and periodically remind West USA's company-owned brokerages, franchisees (if any), and their agents that there is no West USA requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;

ii.     require that any West USA company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then West USA will require that any

18

company-owned brokerages and their agents (and recommend and encourage that any West USA franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii. prohibit all West USA company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv. require that West USA company-owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each listing marketed to prospective buyers in any format;

v. prohibit West USA company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi. advise and periodically remind West USA company-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii. for each of the above points, for company-owned brokerages, franchisees, and

19

their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

51.     If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 50 will sunset 5 years after the Effective Date.  West USA agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel.

52.     West USA acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its best efforts to implement the practice changes specified in this Section.

## J.  Cooperation

53.     West USA (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will provide valuable cooperation to Plaintiffs as follows in the Actions. Any disputes regarding the scope of these provisions or compliance with these provisions shall be referred to Hon. David Duncan or another mediator, mutually chosen by the parties, for binding resolution. West USA:

     i.   will use reasonable best efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

     ii.   use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

20

iii.    will use reasonable best efforts at its expense to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

iv.    agree that this Settlement Agreement shall not preclude Plaintiffs from seeking the production of non-privileged documents in West USA's possession, custody, or control;

v.    if another Defendant includes a witness on a witness list who is then a current officer or employee of West USA or its subsidiaries, West USA will cooperate in providing access via counsel to that witness prior to deposition or trial testimony; and

vi.    agree not to provide greater assistance in discovery or trial to any defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

54.    West USA's cooperation obligations, as set forth in Paragraph 52, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

55.    West USA's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to West USA. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-West USA Defendants and the time for appeal or to seek permission to appeal from the from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

56.     West USA acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its reasonable best efforts to provide the cooperation specified in this Section.

**L.  Miscellaneous**

57.     This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party.  West USA denies the material allegations of the complaints in the Actions.  Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by West USA, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by West USA in any proceeding.

58.     This Settlement Agreement was reached after arm's-length negotiations after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation.  The terms of the settlement continue to be subject to any settlement privilege and must be kept strictly confidential until a motion for preliminary approval is filed.

59.     Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.

60.     This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-West USA Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties.  All rights of any Settlement Class Member against any Non-West USA Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other

Settlement Class Members.

61.    This Settlement Agreement constitutes the entire agreement among Plaintiffs and West USA pertaining to the Settlement of the Actions against West USA.  This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and West USA.

62.    This Settlement Agreement may be executed in counterparts by Plaintiffs and West USA, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

63.    Neither Plaintiffs nor West USA shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

64.    The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

65.    The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

66.    The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

67.    Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will.  Each Settling Party represents and warrants that it has

sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

68.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.


Date: _____ day of August, 2025


_____
On behalf of West USA Realty, Inc.

CO-LEAD COUNSEL

_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP


_____
Ketchmark & McCreight PC


_____
Boulware Law LLC

Williams Dirks Dameron LLC

Zimmerman Reed LLP

sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

68.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

Date: _____ day of June

_____
On behalf of West USA Realty, Inc.

CO-LEAD COUNSEL

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

_____
Boulware Law LLC

# Exhibit F

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into as [DATE] (the "Execution Date"), and is by and between My Home Group Real Estate, LLC ("My Home Group") and Plaintiffs Rhonda Burnett, Jeremy Keel, Christopher Moehrl, Daniel Umpa, Don Gibson, and Joseph Masiello (collectively "Plaintiffs," and, together with My Home Group, the "Parties"), who filed suit in *Daniel Umpa v. The National Association of Realtors, et al.*, No. 23-cv-945 (W.D. Mo.) ("*Umpa*"), *Don Gibson v. The National Association of Realtors, et al*., No. 23-cv-00788 (W.D. Mo.) ("*Gibson*"), *Burnett v. The National Association of Realtors, et al.*, No. 19-cv-0332-SRB (W.D. Mo.) ("*Burnett*"), *Moehrl v. The National Association of Realtors, et al*., No 1:19-cv-01610 NAR (N.D. Ill. Case No. 1:19-cv-01610) ("*Moehrl*"), *Jeremy Keel v. Washington Fine Properties, LLC, et al*., No.25-cv-00055 (W.D. Mo.) ("*Keel*"), and *Joseph Masiello v. Arizona Association of Realtors, et al.*, No. 24-cv-00045 (D. Ariz.) ("*Masiello*"), and any forthcoming case as identified in Paragraph 16 below (all three actions collectively, "the Actions"), both individually and as representatives of one or more classes of home sellers.

WHEREAS, My Home Group denies Plaintiffs' allegations in the Actions and indicated it would assert defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel (as defined below) and counsel for My Home Group leading to this Settlement Agreement;

WHEREAS, the Actions will continue against all other defendants in the Actions, other than My Home Group (the "Non-My Home Group Defendants") unless Plaintiffs separately settle with any of the Non-My Home Group Defendants;

1

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, and have concluded that a settlement with My Home Group according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, My Home Group believes that it is not liable for any claims asserted and has good defenses to Plaintiffs' claims, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, My Home Group in addition to the settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between My Home Group and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to My Home Group only, without costs to Plaintiffs, the Settlement Class, or My Home Group except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

A.     **<u>Definitions</u>**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.      "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210

Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067

With respect to this Settlement only, Co-Lead Counsel also means:

ZIMMERMAN REED LLP
14648 North Scottsdale Road, Suite 130
Scottsdale, AZ 85254

2.     "Court" means the U.S. District Court for the Western District of Missouri.

3.     "Defendants" all defendants named in the Actions.

4.     "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

5.     "Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against My Home Group with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement Agreement and the entry of a final judgment has

expired or, if appealed, approval of the Settlement Agreement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non- My Home Group Defendant or any person or entity related to the Non-My Home Group Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

6.      "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

7.      "Released Claims" means any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

8.      "Released Parties" means My Home Group and all of its respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant

4

to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, sub-franchisors, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' and sub-franchisors' officers, directors, managing directors, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non- My Home Group Defendants or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the My Home Group Entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with My Home Group and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release My Home Group or any other Person for any claims based on the conduct of any real estate brokerage acquired by My Home Group or any other Person who becomes affiliated with My Home Group after the Execution Date for conduct which took place before the Execution Date.

9.      "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

10.      "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

11.      "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019, and date of Class Notice.  For avoidance of doubt, Plaintiffs and My Home Group intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release.

12.      "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

13.      "Settling Parties" means Plaintiffs and My Home Group.

14.      "Total Monetary Settlement Amount" means Nine Hundred Eighty Seven-Thousand Five Hundred DOLLARS ($987,500) in United States currency.  All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the

Total Monetary Settlement Amount, and My Home Group will pay nothing apart from the Total Monetary Settlement Amount.

**B.**     <u>**Stipulation to Class Certification for Settlement Purposes**</u>

15.     For purposes of facilitating this Settlement Agreement, and for that reason only, My Home Group acknowledges and agrees that it will be named as a defendant in a new class action lawsuit arising from the same conspiracy alleged in *Burnett*, *Moehrl*, *Gibson*, *Umpa, Keel, and Masiello* (in which case, such new lawsuit will be included within the term "Actions"). The new lawsuit will be filed in the United States District Court for the Western District of Missouri, Western Division. My Home Group will (a) not contest the jurisdiction and venue of the Western District of Missouri for purposes of this settlement only, (b) accept service for the new lawsuit, and (c) not contest the transfer of the new lawsuit to the court of Judge Stephen R. Bough, if it is not randomly assigned there. To the extent necessary, My Home Group hereby agrees to work in good faith with Plaintiffs and Co-Lead Counsel towards Plaintiffs' efficiently and timely filing of the new action and transfer of it to Judge Bough's court. If any Party validly rescinds this Settlement Agreement for any reason, as provided in Paragraphs 43-49 below, then the Parties agree to seek dismissal of any claims against My Home Group in the new class action referenced in this Paragraph, and the plaintiffs in the *Masiello* case and My Home Group agree to resume litigation in the *Masiello* case in the United States District Court for the District of Arizona.

16.     The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to My Home Group. Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void. My

Home Group and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by My Home Group or Plaintiffs, including, but not limited to, any defenses concerning the Court's lack of personal jurisdiction over My Home Group or any Released Parties. Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be construed as or deemed to be evidence of an admission or concession by My Home Group that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

17.     My Home Group hereby agrees that with respect to the Released Claims, any applicable statute of limitations or other time defenses shall be deemed tolled from the Execution Date until this Settlement Agreement is either finalized or rescinded.

**C.     Approval of this Settlement Agreement and Dismissal of the Actions**

18.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e) and scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to My Home Group.

19.     Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). The Motion shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement. The proposed form of the preliminary approval order shall be acceptable to My Home Group provided that it is

substantially in the form of the orders proposed in connection with the Keller Williams, Anywhere, and RE/MAX settlements. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of a mediator and will endeavor to resolve any issues to the satisfaction of the Court.

20.     The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement with any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets the requirements of due process and Federal Rule of Civil Procedure 23 ("Class Notice"). The Settling Parties agree that the notice language shall not be subject to My Home Group's review or approval so long as it is substantially in the form of one or more prior Court-approved notices. To the extent Plaintiffs seek to materially vary the language of the notice, they will promptly notify My Home Group in writing of any such changes, and My Home Group will provide any edits or objections within 48 hours, and the Settling Parties shall promptly meet and confer to resolve any such objection. The Settling Parties agree to the use JND as a claims and notice administrator. The timing of any request to disseminate Class Notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

21.     Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, shall at My Home Group's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

22.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to My Home Group:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to My Home Group only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) if applicable, determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to My Home Group.

27.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

## D.     <u>Releases, Discharge, and Covenant Not to Sue</u>

28.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money,

or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement Agreement arising from, arising out of, or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

29. The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN

11

HIS OR HER FAVOR AT THE TIME OF EXECUTING
THE RELEASE AND THAT, IF KNOWN BY HIM OR
HER, WOULD HAVE MATERIALLY AFFECTED HIS
OR HER SETTLEMENT WITH THE DEBTOR OR
RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Settlement Agreement.

30. The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against

his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions.

## E.     Payment of the Settlement Amount

31.     Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). All accrued interest shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of My Home Group. My Home Group shall pay $100,000 within 90 days of preliminary approval; $400,000 within the earlier of 90 days of Final Approval (as defined below) and December 31, 2026; and $487,500 within the earlier of one year of Final Approval (as defined below) and December 31, 2027. Time is of the essence as it relates to the timeliness of the settlement payment, and any failure to timely make any payment will constitute a material default under this Agreement. For the purposes of this Paragraph, "Final Approval" means approval, as ordered by the Western District of Missouri, and the exhaustion of any appeals.

## F.     The Settlement Fund

32.     The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund."  The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid

out of the Settlement Fund. In no event will My Home Group's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

33. The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement, except those reflected in Paragraph 34. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

34. After preliminary approval of the Settlement Agreement and approval of a class notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class. My Home Group will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $100,000 to pay the costs for notice and administration. If Plaintiffs settle with one (or more) Non- My Home Group Defendants or newly-named brokerage defendants and notice of one or more other settlements is included in the notice of the My Home Group settlement, then the cost of such notice will be apportioned equitably between (or among) the My Home Group Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for notice and administration costs, up to $100,000, is not refundable to My Home Group in the event the Settlement Agreement does not become Effective or if it is rescinded by My Home Group or the Plaintiffs.

35. Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to

review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund.

36.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

37.     My Home Group will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement.  My Home Group's only payment obligation is to pay the Total Monetary Settlement Amount.

38.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers.  The Settlement will be non-reversionary except as set forth below in Section H.  If the Settlement becomes Effective, no proceeds from the Settlement will revert to My Home Group regardless of the claims that are made.

39.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 34 and 35 above and 43 below.

40.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court.  My Home Group will have no participatory or approval rights with respect to the Plan of Allocation.  It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement

Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement. The Settlement Class, Plaintiffs, and My Home Group shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

41.    The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against My Home Group or the Released Parties.

## G.    **Taxes**

42.    Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. My Home Group has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to My Home Group. In the event the Settlement does not become Effective and any funds including interest or other income are returned to My Home Group, My Home Group will be responsible for the payment of

16

all taxes (including any interest or penalties), if any, on said interest or other income. My Home Group makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**H.**    **Rescission**

43.    If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if such approval is modified in or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by My Home Group or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order.

44.    Within ten days of rescission pursuant to this Section, the *Masiello* Plaintiff and My Home Group agree to file a joint notice of rescission in the *Masiello* Case asking that the case resume, as to My Home Group, as if it were April 30, 2025.

45.    If the Settlement or Settlement Agreement is validly rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to My Home Group. In the event that the Settlement Agreement is rescinded, the funds already

expended from the Settlement Fund for the costs of notice and administration will not be returned to My Home Group. Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to My Home Group.

46. If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions (in the *Masiello* Case only) as of the Execution Date. Plaintiffs and My Home Group agree that any rulings or judgments that occur in the Actions on or after the date all parties sign this Settlement Agreement and before this Settlement Agreement is rescinded will not bind Plaintiffs, My Home Group or any of the Released Parties. Plaintiffs and My Home Group agree to waive any argument of claim or issue preclusion against Plaintiffs or My Home Group arising from such rulings or judgments. In the event of rescission, the Actions will proceed only in the *Masiello* Case as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. My Home Group and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by My Home Group or the Plaintiffs. The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from April 30, 2025, until the date this Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

47. My Home Group warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Settlement Agreement is executed and

will warrant and represent that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Total Monetary Settlement Amount are actually transferred or made. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of My Home Group to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of My Home Group, then, at the election of Plaintiff counsel, the settlement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

48. The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

49. My Home Group reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

**I. Practice Changes**

50. As soon as practicable, and in no event later than six months after the Effective Date, My Home Group (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will implement the following practice changes:

        i.    advise and periodically remind My Home Group's company-owned brokerages, franchisees (if any), and their agents that there is no My Home Group requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if

made, such offers must be blanket, unconditional, or unilateral;

ii.    require that any My Home Group company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then My Home Group will require that any company-owned brokerages and their agents (and recommend and encourage that any My Home Group franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii.    prohibit all My Home Group company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free, unless they receive no financial compensation from any sources for those services;

iv.    require that My Home Group-owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each active listing marketed to prospective buyers in any format;

v.    prohibit My Home Group-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.    advise and periodically remind My Home Group-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii.    for each of the above points, for company-owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

51.    If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 50 will sunset 5 years after the Effective Date.

52.    My Home Group acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its reasonable best efforts to implement the practice changes specified in this Section.

**J.  Cooperation**

53.     My Home Group (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will provide valuable cooperation to Plaintiffs as follows in the Actions. Any disputes regarding the scope of these provisions or compliance with these provisions shall be referred to a mediator, mutually chosen by the parties, for binding resolution. My Home Group:

    i.    will use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

    ii.    use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

    iii.    will use reasonable efforts at its expense to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

    iv.    if another Defendant includes a witness on a witness list who is then a current officer or employee of My Home Group or its subsidiaries, My Home Group will use reasonable efforts to cooperate in providing access via counsel to that witness prior to trial testimony; and

> v.     agree not to provide greater assistance in discovery or trial to any defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

54.     My Home Group's cooperation obligations, as set forth in Paragraph 53, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

55.     My Home Group's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to My Home Group. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-My Home Group Defendants and the time for appeal or to seek permission to appeal from the from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

56.     My Home Group acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use reasonable efforts to provide the cooperation specified in this Section.

**L.   <u>Miscellaneous</u>**

57.     This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party. My Home Group denies the material allegations of the complaints in the Actions. Neither this

Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by My Home Group, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by My Home Group in any proceeding.

58.     This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation.  The terms of the settlement continue to be subject to any settlement privilege and must be kept strictly confidential until a motion for preliminary approval is filed.

59.     Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions. The Parties will not use that the agreement is to be governed by Missouri law as grounds for personal jurisdiction in any litigation (other than in connection with the enforcement of this Settlement Agreement or as otherwise explicitly provided for by this Settlement Agreement). The Parties stipulate that My Home Group will be subject to the Court's jurisdiction for purposes of interpreting, approving, and enforcing the Settlement Agreement.

60.     This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-My Home Group Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties.  All rights of any Settlement Class Member against any Non-My Home Group Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

61.     This Settlement Agreement constitutes the entire agreement among Plaintiffs and My Home Group pertaining to the Settlement of the Actions against My Home Group. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and My Home Group.

62.     This Settlement Agreement may be executed in counterparts by Plaintiffs and My Home Group, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

63.     Neither Plaintiffs nor My Home Group shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

64.     The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

65.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

66.     The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

67.     Any disputes between My Home Group and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented to a mediator jointly chosen by the parties for assistance in mediating a resolution.

68.     Each Settling Party acknowledges that he, she or it has been and is being fully

advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

69.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.


Date: ____ day of August


_____
Marco Fregenal
President of My Home Group Real Estate, LLC

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

Ketchmark & McCreight PC

Boulware Law LLC

Williams Dirks Dameron LLC

Zimmerman Reed LLP

# Exhibit G

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into as of the last date of signature (the "Execution Date"), and is by and between Tierra Antigua Realty, LLC ("Tierra Antigua") and Plaintiffs Daniel Umpa, Don Gibson, and Joseph Masiello (collectively "Plaintiffs"), who filed suit in *Daniel Umpa v. The National Association of Realtors, et al.*, No. 23-cv-945 (W.D. Mo.), *Don Gibson v. The National Association of Realtors, et al.*, No. 23-cv-00788 (W.D. Mo.), and *Joseph Masiello v. Arizona Association of Realtors, et al.*, No. 24-cv-00045 (D. Ariz.), and any forthcoming case as identified in Paragraph 19 below (all three actions collectively, "the Actions"), both individually and as representatives of one or more classes of home sellers.

WHEREAS, Tierra Antigua denies Plaintiffs' allegations in the Actions and indicated it would assert defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for Tierra Antigua leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-Tierra Antigua Defendants unless Plaintiffs separately settle with any of the Non-Tierra Antigua Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, and have concluded that a settlement with Tierra Antigua according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, Tierra Antigua believes that it is not liable for any claims asserted and has good defenses to Plaintiffs' claims, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement,

1

and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, Tierra Antigua in addition to the settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between Tierra Antigua and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to Tierra Antigua only, without costs to Plaintiffs, the Settlement Class, or Tierra Antigua except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

A.      **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.      "Corporate Defendants" means any defendant aside from the National Association of Realtors named in *Gibson, Umpa, Burnett v. NAR*, (W.D. Mo. Case No. 19-CV-0332-SRB), *Moehrl v. NAR*, (N.D. Ill. Case No. 1:19-cv-01610), or *Joseph Masiello v. Arizona Association of Realtors, et al.*, No. 24-cv-00045 (D. Ariz.).

2.      "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067

With respect to this Settlement only, Co-Lead Counsel also means:

ZIMMERMAN REED LLP
14648 North Scottsdale Road, Suite 130
Scottsdale, AZ 85254

3. "Court" means the U.S. District Court for the Western District of Missouri.

4. "Defendants" all defendants named in the Actions.

5. "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

6. "Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against Tierra Antigua with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-Tierra Antigua Defendant or any person or entity related to the Non-Tierra Antigua Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed

3

as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

7.      "Gibson" means Western District of Missouri Case No. 4:19-cv-00332-SRB, which is currently pending.

8.      "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

9.      "Masiello" means Arizona District Court Case No. 24-cv-00045-DLR, which is currently pending.

10.     "Released Claims" means any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

11.     "Released Parties" means Tierra Antigua and all of its respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, sub-franchisors, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all

of the franchisees' and sub-franchisors' officers, directors, managing directors, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-Tierra Antigua Corporate Defendants or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the Tierra Antigua Entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with Tierra Antigua and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release Tierra Antigua or any other Person for any claims based on the conduct of any real estate brokerage acquired by Tierra Antigua or any other Person who becomes affiliated with Tierra Antigua after the Execution Date for conduct which took place before the Execution Date.

12.     "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting

in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

13. "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

14. "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019, and date of Class Notice. For avoidance of doubt, Plaintiffs and Tierra Antigua intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release.

15. "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

16. "Settling Parties" means Plaintiffs and Tierra Antigua.

17. "Total Monetary Settlement Amount" means Four Hundred-Thousand DOLLARS ($400,000) in United States currency. All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount, and Tierra Antigua will pay nothing apart from the Total Monetary Settlement Amount.

18. "Umpa" means Western District of Missouri Case No. 23-cv-00945, which is currently pending.

**B.** **Stipulation to Class Certification for Settlement Purposes**

19. Tierra Antigua acknowledges and agrees that it will be named as a defendant in a new class action lawsuit arising from the same conspiracy alleged in *Burnett*, *Moehrl*, *Gibson*, *Umpa, and Masiello* (in which case, such new lawsuit will be included within the term "Actions"). The new

lawsuit will be filed in the United States District Court for the Western District of Missouri, Western Division. Tierra Antigua agrees to (a) the jurisdiction and venue of the Western District of Missouri for purposes of this settlement only, (b) accept service for the new lawsuit, and (c) to the transfer of the new lawsuit to the court of Judge Stephen R. Bough, if it is not randomly assigned there. To the extent necessary, Tierra Antigua hereby agrees to work in good faith with Plaintiffs and Co-Lead Counsel to efficiently and timely file the new action and have it transferred to Judge Bough's court. If any Party validly rescinds this Settlement Agreement for any reason, as provided in Paragraphs 43-49 below, then the Parties agree to seek dismissal of any claims against Tierra Antigua in the new class action referenced in this Paragraph, and the plaintiffs in the *Masiello* case and Tierra Antigua agree to resume litigation in the *Masiello* case in the United States District Court for the District of Arizona.

20.     The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Tierra Antigua.  Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void. Tierra Antigua and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by Tierra Antigua or Plaintiffs, including, but not limited to, any defenses concerning the Court's lack of personal jurisdiction over Tierra Antigua or any Released Parties.  Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be construed as or deemed to be evidence of an admission or concession by Tierra Antigua that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

21.     Tierra Antigua hereby agrees that with respect to the Released Claims, any applicable statute of limitations or other time defenses shall be deemed tolled from the Execution Date until this Settlement Agreement is either finalized or rescinded.

**C.     Approval of this Settlement Agreement and Dismissal of the Actions**

22.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e) and scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to Tierra Antigua.

23.     Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion").  The Motion shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement.  The proposed form of the preliminary approval order shall be acceptable to Tierra Antigua provided that it is substantially in the form of the orders proposed in connection with the Keller Williams, Anywhere, and RE/MAX settlements. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement.  To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of mediator Hon. David Duncan and will endeavor to resolve any issues to the satisfaction of the Court.

24.     The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement with any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets the requirements of due process and Federal Rule of Civil

Procedure 23 ("Class Notice"). The Settling Parties agree that the notice language shall not be subject to Tierra Antigua's review or approval so long as it is substantially in the form of one or more prior Court-approved notices. To the extent Plaintiffs seek to materially vary the language of the notice, they will promptly notify Tierra Antigua in writing of any such changes, and Tierra Antigua will provide any edits or objections within 48 hours, and the Settling Parties shall promptly meet and confer to resolve any such objection. The Settling Parties agree to the use JND as a claims and notice administrator. The timing of any request to disseminate Class Notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

25. Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, shall at Tierra Antigua's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

26. If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to Tierra Antigua:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to Tierra Antigua only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and

9

consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) if applicable, determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to Tierra Antigua.

27.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

**D.     Releases, Discharge, and Covenant Not to Sue**

28.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes.  In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims.  For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

29.     The Releasing Parties may hereafter discover facts other than or different from those

which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Agreement.

11

30. The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in the Actions), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions.

**E.      Payment of the Settlement Amount**

31. Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). All accrued interest shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of Tierra Antigua. Tierra Antigua shall pay $400,000 within 30 days of preliminary approval. Time is of the essence as it relates to the timeliness of the settlement payment, and any failure to timely make any payment will constitute a material default under this Agreement.

**F.      The Settlement Fund**

32. The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all

applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund. In no event will Tierra Antigua's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

33.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

34.     Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class. Tierra Antigua will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $100,000 to pay the costs for notice and administration. If Plaintiffs settle with one (or more) Non-Tierra Antigua Corporate Defendants or newly-named brokerage defendants and notice of one or more other settlements is included in the notice of the Tierra Antigua settlement, then the cost of such notice will be apportioned equitably between (or among) the Tierra Antigua Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for notice and administration costs, up to $100,000, is not refundable to Tierra Antigua in the event the Settlement Agreement does not become Effective or if it is rescinded by Tierra Antigua or the Plaintiffs.

35.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund.

36.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

37.     Tierra Antigua will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement.  Tierra Antigua's only payment obligation is to pay the Total Monetary Settlement Amount.

38.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers.  The Settlement will be non-reversionary except as set forth below in Section H.  If the Settlement becomes Effective, no proceeds from the Settlement will revert to Tierra Antigua regardless of the claims that are made.

39.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 34 and 35 above and 43 below.

40.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court.  Tierra Antigua will have no participatory or approval rights with respect to the Plan of Allocation.  It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement.  The Settlement Class, Plaintiffs, and Tierra Antigua shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity

14

or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

41.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against Tierra Antigua or the Released Parties.

**G.     Taxes**

42.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund.  All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund.  Tierra Antigua has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to Tierra Antigua.  In the event the Settlement does not become Effective and any funds including interest or other income are returned to Tierra Antigua, Tierra Antigua will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income.  Tierra Antigua makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

**H.     Rescission**

43.     If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if

such approval is modified in or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by Tierra Antigua or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order.

44.     Within ten days of rescission pursuant to this Section, the *Masiello* Plaintiff and Tierra Antigua agree to file a joint notice of rescission in the *Masiello* Case asking that the case resume, as to Tierra Antigua, as if it were February 4, 2025.

45.     If the Settlement or Settlement Agreement is validly rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to Tierra Antigua. In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to Tierra Antigua. Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to Tierra Antigua.

46.     If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions (in the *Masiello* Case only) as of the Execution Date.  Plaintiffs and Tierra Antigua agree that any rulings or judgments that occur in the Actions on or after the date all parties sign this Settlement Agreement and before this Settlement Agreement is rescinded will not bind

16

Plaintiffs, Tierra Antigua or any of the Released Parties. Plaintiffs and Tierra Antigua agree to waive any argument of claim or issue preclusion against Plaintiffs or Tierra Antigua arising from such rulings or judgments. In the event of rescission, the Actions will proceed only in the *Masiello* Case as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. Tierra Antigua and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by Tierra Antigua or the Plaintiffs. The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from February 4, 2025, until the date this Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

47.     Tierra Antigua warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Settlement Agreement is executed and will warrant and represent that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Total Monetary Settlement Amount are actually transferred or made. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of Tierra Antigua to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Tierra Antigua, then, at the election of Plaintiff counsel, the settlement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

48.     The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

49.     Tierra Antigua reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

**I.   <u>Practice Changes</u>**

50.     As soon as practicable, and in no event later than six months after the Effective Date, Tierra Antigua (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will implement the following practice changes:

      i.    advise and periodically remind Tierra Antigua's company-owned brokerages, franchisees (if any), and their agents that there is no Tierra Antigua requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;

      ii.    require that any Tierra Antigua company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then Tierra Antigua will require that any

company-owned brokerages and their agents (and recommend and encourage that any Tierra Antigua franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii.   prohibit all Tierra Antigua company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

iv.   require that Tierra Antigua company-owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each listing marketed to prospective buyers in any format;

v.   prohibit Tierra Antigua company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.   advise and periodically remind Tierra Antigua company-owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii.    for each of the above points, for company-owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

51.    If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 50 will sunset 5 years after the Effective Date.  Tierra Antigua agrees to provide proof of compliance with these practice changes if requested by Co-Lead Counsel.

52.    Tierra Antigua acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its best efforts to implement the practice changes specified in this Section.

## J.    <u>Cooperation</u>

53.    Tierra Antigua (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will provide valuable cooperation to Plaintiffs as follows in the Actions. Any disputes regarding the scope of these provisions or compliance with these provisions shall be referred to Hon. David Duncan or another mediator, mutually chosen by the parties, for binding resolution. Tierra Antigua:

i.    will use reasonable best efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

ii.    use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are

otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

iii.   will use reasonable best efforts at its expense to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

iv.   agree that this Settlement Agreement shall not preclude Plaintiffs from seeking the production of non-privileged documents in Tierra Antigua's possession, custody, or control;

v.   if another Defendant includes a witness on a witness list who is then a current officer or employee of Tierra Antigua or its subsidiaries, Tierra Antigua will cooperate in providing access via counsel to that witness prior to deposition or trial testimony; and

vi.   agree not to provide greater assistance in discovery or trial to any defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

54.   Tierra Antigua's cooperation obligations, as set forth in Paragraph 52, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

55.   Tierra Antigua's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to Tierra Antigua. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-Tierra Antigua Defendants and the time for appeal or to seek permission to appeal from the from the entry of a final judgment has expired or, if appealed, any final

judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

56.     Tierra Antigua acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its reasonable best efforts to provide the cooperation specified in this Section.

**L.  Miscellaneous**

57.     This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party.  Tierra Antigua denies the material allegations of the complaints in the Actions.  Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Tierra Antigua, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by Tierra Antigua in any proceeding.

58.     This Settlement Agreement was reached after arm's-length negotiations after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation.  The terms of the settlement continue to be subject to any settlement privilege and must be kept strictly confidential until a motion for preliminary approval is filed.

59.     Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.

60.     This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-Tierra Antigua Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties.  All rights of any Settlement

Class Member against any Non-Tierra Antigua Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

61.     This Settlement Agreement constitutes the entire agreement among Plaintiffs and Tierra Antigua pertaining to the Settlement of the Actions against Tierra Antigua.  This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and Tierra Antigua.

62.     This Settlement Agreement may be executed in counterparts by Plaintiffs and Tierra Antigua, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

63.     Neither Plaintiffs nor Tierra Antigua shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

64.     The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

65.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

66.     The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

67.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling

Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

68. Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

Date: _____ day of August

_____
On behalf of Tierra Antigua Realty, LLC

CO-LEAD COUNSEL

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

_____
Boulware Law LLC

_____
Williams Dirks Dameron LLC

_____
Zimmerman Reed LLP

25

Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

68. Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

Date: _____ day of June


_____
On behalf of Tierra Antigua Realty, LLC

CO-LEAD COUNSEL


_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP


_____
Ketchmark & McCreight PC

# Exhibit H

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into as of the 21st day of May, 2025 (the "Execution Date"), and is by and between Charles Rutenberg Realty, Inc. ("CRR") and Plaintiffs Rhonda Burnett, Jerod Breit, Jeremy Keel, Hollee Ellis, Frances Harvey, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, Jane Ruh, Don Gibson, Lauren Criss, and John Meiners (collectively "Plaintiffs", and together with CRR "the Parties"), who filed suit in in the above captioned actions and in *Daniel Umpa v. The National Association of Realtors, et al.*, No. 23-cv-945 (W.D. Mo.), *Don Gibson v. The National Association of Realtors, et al.*, No. 23-cv-00788 (W.D. Mo.), *Burnett v. The National Association of Realtors, et al.*, No. 19-CV-0332-SRB (W.D. Mo.), *Moehrl v. The National Association of Realtors, et al.*, No 1:19-cv-01610 *NAR* (N.D. Ill. Case No. 1:19-cv-01610) and *Jeremy Keel v. Washington Fine Properties, LLC, et al.*, No.25-cv-00055 (W.D. Mo.) ("*Keel*") (all five actions, with *Land Trust*, as defined below, collectively, "the Actions"), both individually and as representatives of one or more classes of home sellers.

WHEREAS, the allegations in the Actions set forth claims for damages and for injunctive relief;

WHEREAS, CRR denies the allegations in the Actions and indicated it would assert defenses to Plaintiffs' claims if sued;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel (as defined below), plaintiff's counsel in *Land Trust No. 2020 Continental Avenue, #221 v. Watson Realty Corp., et al.*, Case No. 1:24-cv-22937 (S.D. Fla.) ("*Land Trust*") in which CRR was named as a defendant, and counsel for CRR, leading to this Settlement Agreement;

1

WHEREAS, the Actions will continue against all other defendants in the Actions, other than CRR (the "Non-CRR Defendants") unless Plaintiffs separately settle with any of the Non-CRR Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, and have concluded that a settlement with CRR according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, CRR believes that it is not liable for any claims asserted and has good defenses to Plaintiffs' claims, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, CRR, in addition to the settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between CRR and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to CRR only, without costs to Plaintiffs, the Settlement Class or CRR except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

**A.** **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

2

1.     "Co-Lead Counsel" means the following law firms:

   KETCHMARK AND MCCREIGHT P.C.
   11161 Overbrook Road, Suite 210
   Leawood, KS 66211

   BOULWARE LAW LLC
   1600 Genessee, Suite 416
   Kansas City, MO 64102

   WILLIAMS DIRKS DAMERON LLC
   1100 Main Street, Suite 2600
   Kansas City, MO 64105

   HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Second Avenue, Suite 2000
   Seattle, WA 98101

   COHEN MILSTEIN SELLERS & TOLL PLLC
   1100 New York Ave. NW, Fifth Floor
   Washington, DC 20005

   SUSMAN GODFREY LLP
   1900 Avenue of the Stars
   Suite 1400
   Los Angeles, CA 90067

2.     "Court" means the U.S. District Court for the Western District of Missouri.

3.     "Defendants" all defendants named in the Actions.

4.     "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

5.     "Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against CRR with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement Agreement and the entry of a final judgment has expired or, if appealed, approval of the Settlement Agreement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject

3

to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-CRR Defendant or any person or entity related to the Non-CRR Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement Agreement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

6.    "Person" means an individual, corporation, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and such individual's or entity's spouse, heirs, predecessors, successors, representatives, affiliates and assignees. For the avoidance of doubt, Persons include all real estate brokerages.

7.    "Released Claims" means any and all manner of federal and state claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

8.    "Released Parties" means CRR and each of its respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, sub-franchisors, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts,

4

heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' and sub-franchisors' officers, directors, managing directors, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include any Non-CRR Defendants, or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the CRR Entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with CRR and excluded for the periods of time they were associated with a different Corporate Defendant. For the avoidance of doubt, the foregoing release is not intended to and does not release CRR or any other Person for any claims based on the conduct of any real estate brokerage acquired by CRR or any other Person who becomes affiliated with CRR after the Execution Date for conduct which took place before the Execution Date.

9.    "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting

in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members).

10. "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

11. "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home between October 31, 2019 and date of Class Notice. For avoidance of doubt, Plaintiffs and CRR intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release.

12. "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

13. "Settling Parties" means Plaintiffs and CRR.

14. "Total Monetary Settlement Amount" means SEVEN HUNDRED AND FIFTY THOUSAND DOLLARS ($750,000).

15. All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount, and CRR will pay nothing apart from the Total Monetary Settlement Amount.

**B.    Stipulation to Class Certification for Settlement Purposes**

16. For purposes of facilitating this Settlement Agreement, and for that reason only, CRR acknowledges and agrees that it will be named as a defendant in the *Keel* action arising from the same conspiracy alleged in the Actions. CRR agrees to (a) the jurisdiction and venue of the Western District of Missouri, and (b) accept service for the new lawsuit; notwithstanding any of the foregoing,

the agreement to jurisdiction and transfer is for purposes of facilitating this Settlement Agreement and shall have no operation or effect should the Settlement not become Effective.

17.     The Settling Parties hereby stipulate for purposes of this Settlement Agreement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to CRR. The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only. Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of this Settlement Agreement shall become null and void. CRR and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by CRR or Plaintiffs, including, but not limited to, any defenses concerning the Court's lack of personal jurisdiction over CRR or any Released Parties; notwithstanding any of the foregoing, if the Settlement Agreement does not become Effective, Co-Lead Counsel for Plaintiffs shall dismiss CRR from the *Keel* lawsuit without prejudice within ten (10) days with each side to bear their own cost.

18.     CRR hereby agrees that with respect to the Released Claims, any applicable statute of limitations or other time defenses shall be deemed tolled from August 1, 2024 until this Settlement Agreement is either finalized or rescinded.

C.     **Approval of this Settlement Agreement and Dismissal of the Actions**

19.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e); and scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to CRR; and CRR's cooperation by providing information reflecting its ability to pay

7

limitations and, if requested by Co-Lead Counsel, a declaration describing and attesting to those limitations.

20.    Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). The Motion shall include a proposed form of order preliminarily approving the Settlement and enjoining Releasing Parties from prosecuting any Released Claims in any forum until the Effective Date of this Settlement. The proposed form of the preliminary approval order shall be acceptable to CRR provided that it is substantially in the form of the orders proposed in connection with the Keller Williams, Anywhere, and RE/MAX settlements. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement and will endeavor to resolve any issues to the satisfaction of the Court.

21.    The Settling Parties agree that Plaintiffs may at their sole discretion: (i) seek to include notice of this Settlement to the Settlement Class and for claim administration along with the settlement with any other Defendant or (ii) seek approval of a separate plan for providing class notice of this Settlement in a manner that meets the requirements of due process and Federal Rule of Civil Procedure 23 ("Class Notice"). The Settling Parties agree that the notice language shall not be subject to CRR's review or approval so long as it is substantially in the form of one or more prior Court-approved notices. To the extent Plaintiffs seek to materially vary the language of the notice, CRR must provide any edits or objections within 24 hours, and the Settling Parties shall promptly meet and confer to resolve any such objection. The Settling Parties agree to the use JND as a claims and notice administrator. The timing of any request to disseminate Class Notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

8

22.     Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, JND, the notice administrator, may at CRR's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

23.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to CRR:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to CRR only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) If applicable, determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to CRR.

24.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

9

**D.    Releases, Discharge, and Covenant Not to Sue**

25.    Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release each of the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement Agreement arising from, arising out of, or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties that accrued from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, the release set forth in this Settlement Agreement extends to, but only to, the fullest extent permitted by law.

26.    The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts,

10

as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Agreement.

28. The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of

11

any kind (other than a breach of contract or tort based on any factual predicate in this Action), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions.

**E.**   **Payment of the Settlement Amount**

29.    Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). All accrued interest shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of CRR. CRR shall pay the Total Monetary Settlement Amount within 30 days of preliminary approval of this Settlement by depositing the payment into the Escrow Account on or before this deadline. Time is of the essence as it relates to the timeliness of the settlement payments, and any failure to timely make the payment will constitute a material default under this Agreement. If CRR fails to timely make the payment, then Plaintiffs, in their sole and exclusive discretion, shall have the option to either (a) sue for the recovery of the entire unpaid Total Monetary Settlement Amount immediately, or (b) rescind this Settlement Agreement, including the releases contained herein, by written notice to Plaintiffs and proceed with litigating the Released Claims.

**F.**   **The Settlement Fund**

30.    The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual

12

expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund. In no event will CRR's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

31.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement, except those reflected in Paragraph 32. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

32.     After preliminary approval of the Settlement and approval of a class notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement and the Settlement Agreement to potential members of the Settlement Class. CRR will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $100,000 to pay the costs for notice. If Plaintiffs settle with one (or more) Non-CRR Defendants or newly-named brokerage defendants and notice of one or more other settlements is included in the notice of the CRR settlement, then the cost of such notice will be apportioned equitably between (or among) the CRR Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for notice and notice administration costs is not refundable to CRR in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become Effective.

33.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review

13

fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund.

34.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

35.     CRR will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement.   CRR's only payment obligation is to pay the Total Monetary Settlement Amount.

36.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers.  The Settlement will be non-reversionary except as set forth below in Section H.  If the Settlement becomes Effective, no proceeds from the Settlement will revert to CRR regardless of the claims that are made.

37.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 32 and 33 above and 40 below.

38.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. CRR will have no participatory or approval rights with respect to the Plan of Allocation.  It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Settlement Agreement and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement and/or the terms of this Settlement Agreement.  The

14

Settlement Class, Plaintiffs, and CRR shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

39.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against CRR or the Released Parties.

**G.     Taxes**

40.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. CRR has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to CRR. In the event the Settlement does not become Effective and any funds including interest or other income are returned to CRR, CRR will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income. CRR makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

## H.    **Rescission**

41.    If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if such approval is modified in any material respect or set aside on appeal in any material respects, or if the Court does not enter final approval, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by CRR or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within 10 business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of this Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order.

42.    If the Settlement or Settlement Agreement is rescinded for any reason permitted by the Agreement, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to CRR.  In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to CRR.  Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to CRR.

43.    If the Settlement or Settlement Agreement is rescinded for any reason permitted by the Agreement before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions as of April 8, 2025.  Plaintiffs and CRR agree that any rulings or judgments that occur in the Actions on or after April 8, 2025 and before this Settlement Agreement is rescinded will not bind Plaintiffs, CRR or any of the Released Parties.  Plaintiffs and CRR agree

16

to waive any argument of claim or issue preclusion against Plaintiffs or CRR arising from such rulings or judgments. In the event of rescission, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose; provided as agreed in Paragraph 17, Co-Lead Counsel will dismiss CRR from the *Keel* action within ten (10) business days. CRR and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by CRR or the Plaintiffs. The Settling Parties agree that pending deadlines for motions not yet filed, and all deadlines (whether pending or past) for motions that will be withdrawn pursuant to this Settlement Agreement, shall be tolled for the period from April 8, 2025, until the date this Settlement or Settlement Agreement is rescinded, and no Settling Party shall contend that filing or renewal of such motions was rendered untimely by or was waived by the operation of this Settlement Agreement.

44. CRR warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Settlement Agreement is executed, and, will warrant and represent, that it is not "insolvent" within the meaning of applicable bankruptcy laws at the time that payments of the Settlement Amount are actually transferred or made. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Settlement Amount, or any portion thereof, by or on behalf of CRR to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of CRR, then, at the election of Plaintiff counsel, the settlement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

45.     The Settling Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

46.     CRR reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

## I.   Practice Changes

47.     As soon as practicable, and in no event later than six months after the Effective Date, CRR (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will implement the following practice changes:

     i.    advise and periodically remind CRR's company-owned brokerages, franchisees (if any), and their agents that there is no CRR requirement that they must make offers to or must accept offers of compensation from buyer brokers or other buyer representatives or that, if made, such offers must be blanket, unconditional, or unilateral;

     ii.   require that any CRR company-owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, then CRR will require that any company-

18

owned brokerages and their agents (and recommend and encourage that any CRR franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

iii. prohibit all CRR company-owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free, unless they receive no financial compensation from any source for those services;

iv. require that CRR owned brokerages and their agents disclose at the earliest moment possible any offer of compensation made in connection with each active listing shared with prospective buyers in any format;

v. prohibit CRR owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker, unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi. advise and periodically remind CRR company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of compensation offered to buyer brokers or other buyer representatives provided that each such property meets the buyer's articulated purchasing priorities;

vii.    for each of the above points, for company owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

48.    If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 47 will sunset 5 years after the Effective Date.

49.    CRR acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its reasonable best efforts to implement the practice changes specified in this Section.

## J. Cooperation

50.    CRR (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will provide valuable cooperation to Plaintiffs as follows in the Actions. Any disputes regarding the scope of these provisions or compliance with these provisions can be referred to a mediator, mutually chosen by the parties, for binding resolution. CRR:

i.    will use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

ii.    use reasonable efforts to provide the facts necessary to establish, where applicable, that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

20

      iii.    will use reasonable efforts to provide relevant class member and listing data and answer questions about that data to support the provision of class notice, administration of any settlements, or the litigation of the Actions;

      iv.    if another Defendant includes a witness on a witness list who is then a current officer or employee of CRR or its subsidiaries, CRR will use reasonable efforts to cooperate in providing access via counsel to that witness prior to trial testimony; and

      v.    agree not to provide greater assistance in discovery or trial to any defendant than to the Plaintiffs, unless required by subpoena or other compulsory process.

51.    CRR's cooperation obligations, as set forth in Paragraph 50, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

52.    CRR's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to CRR. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-CRR Defendants and the time for appeal or to seek permission to appeal from the from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

53.    CRR acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use reasonable efforts to provide the cooperation specified in this Section.

## L. Miscellaneous

54.     This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party.  CRR denies the material allegations of the complaints in the Actions.  Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by CRR, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by CRR in any proceeding.

55.     This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation.  The terms of the settlement continue to be subject to any settlement privilege and must be kept strictly confidential until a motion for preliminary approval is filed.

56.     Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.  The Parties will not use that the agreement is to be governed by Missouri law as grounds for personal jurisdiction in any litigation (other than in connection with the enforcement of this Settlement Agreement or as otherwise explicitly provided for by this Settlement Agreement). The Parties stipulate that CRR will be subject to the Court's jurisdiction for purposes of interpreting, approving, and enforcing the Settlement Agreement.

57.     This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-CRR Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties.  All rights of any Settlement Class Member against any Non-CRR Defendant or an alleged co-conspirator or other person or entity

22

other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

58.     This Settlement Agreement constitutes the entire agreement among Plaintiffs and CRR pertaining to the Settlement of the Actions against CRR. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and CRR.

59.     This Settlement Agreement may be executed in counterparts by Plaintiffs and CRR, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

60.     Neither Plaintiffs nor CRR shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

61.     The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

62.     The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

63.     The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

64.     Any disputes between CRR and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented to Greg Lindstrom or another mediator jointly chosen by the parties for assistance in mediating a resolution and, if a resolution is not reached, to binding arbitration with the mediator.

65.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

66.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

Date: 21st day of May, 2025

**ON BEHALF OF CHARLES RUTENBERG REALTY, INC.**

John Nestor
Charles Rutenberg Realty, Inc.

**ON BEHALF OF CO-LEAD COUNSEL**

Boulware Law LLC

24